**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

JUL 1 3 2012

JAMES N. HATTEN, Clerk

By _____ Deputy Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> Ex Rel. JAMES HUGH POTTS II, ) <br> STATE OF CALIFORNIA, STATE OF ) <br> COLORADO, STATE OF CONNECTICUT, ) <br> STATE OF DELAWARE, DISTRICT OF ) <br> COLUMBIA, STATE OF FLORIDA, STATE ) <br> OF GEORGIA, STATE OF HAWAII, ) <br> STATE OF ILLINOIS, STATE OF ) <br> INDIANA, STATE OF LOUISIANA, STATE ) <br> OF MARYLAND, STATE OF ) <br> MASSACHUSETTS, STATE OF MICHIGAN, ) <br> STATE OF MINNESOTA, STATE OF ) <br> MONTANA, STATE OF NEW HAMPSHIRE, ) <br> STATE OF NEVADA, STATE OF NEW ) <br> JERSEY, STATE OF NEW MEXICO, STATE ) <br> OF NEW YORK, STATE OF NORTH ) <br> CAROLINA, STATE OF OKLAHOMA, STATE ) <br> OF RHODE ISLAND, STATE OF ) <br> TENNESSEE, STATE OF TEXAS, ) <br> COMMONWEALTH OF VIRGINIA, and ) <br> STATE OF WISCONSIN ) <br> Ex Rel. JAMES HUGH POTTS II ) <br>　) <br> 　　Plaintiffs, ) <br>　) <br>　) <br> VS. ) <br>　) <br>　) <br>　) <br> WALGREEN CO, INC., WALGREEN ARIZONA) <br> DRUG OPTION CARE, INC., AMERICAN ) <br> OCCUPATIONAL HEALTH MANAGEMENT, ) <br> INC., BEAUTY.COM, INC., DEPENDICARE) <br> HOME HEALTH, LLC, DR EMPLOYEE ) <br> SERVICES, LLC, DRUGSTORE.COM, INC. ) <br> DRI-I, INC., DUANE READE, INC. ) <br> DUANE READE HOLDINGS, INC., DUANE ) <br> READE INTERNATIONAL, LLC, DUANE ) <br> READE REALTY, INC., FIRST RX ) <br> SPECIALTY AND MAIL SERVICES, LLC, ) <br> HAPPY HARRY'S INC., HAPPY HARRY'S ) | 1 12·CV-2428 <br><br> CIVIL ACTION NO. <br><br> FILED EX PARTE <br> AND UNDER SEAL <br><br><br> JURY DEMANDED |

DISCOUNT DRUG STORES, INC., HHDH, )
INC., I-TRAX HEALTH MANAGEMENT )
SOLUTIONS, INC., LAUREL MOUNTAIN )
MEDICAL SUPPLY, LLC, RAD ONLINE )
SALES, INC., SALU BEAUTY, INC., )
WALGREENS ASSISTANCE, INC., )
WALGREENS NETWORK HEALTH SERVICES, )
LLC, WALGREENS SPECIALTY PHARMACY )
HOLDINGS, INC., WALGREENS SPECIALTY)
PHARMACY, LLC, WVC INVESTMENTS, LLC)
MEDNOW INFUSION, LLC, MERIDIAN )
COMP OF NEW YORK, INC., MOSSO'S )
MEDICAL SUPPLY COMPANY, LLC, )
OPTION CARE ENTERPRISES, INC., )
OPTION CARE HOME HEALTH, L.L.C., )
WALGREENS INFUSION SERVICES, INC., )
OPTIONET, INC., WALGREENS SPECIALTY)
CARE CENTERS, LLC, TAKE CARE )
EMPLOYER SOLUTIONS, LLC, TAKE CARE )
HEALTH SYSTEMS, INC., TAKE CARE )
HEALTH SYSTEMS, LLC, ULTRA CARE, )
LLC, WALGREENS VENTURE CAPITAL, LLC)
WALGREENS STORE NO. 3332, LLC, )
WALGREENS STORE NO. 4650, LLC, )
WALGREENS STORE NO. 4651, LLC, )
WALGREENS STORE NO. 5576, LLC, )
WALGREENS STORE NO. 5838, LLC, )
WALTRUST PROPERTIES, INC., WHOLE )
HEALTH MANAGEMENT, LLC, WALGREEN OF)
HAWAII, LLC, WALGREEN OF MAUI, INC.)
BOND DRUG COMPANY OF ILLINOIS, LLC)
BOWEN DEVELOPMENT COMPANY, )
DEERFIELD FUNDING CORPORATION, )
EAST-WEST DISTRIBUTING CO., )
MEDICATION ADHERENCE SOLUTIONS, )
LLC, THE 1901 GROUP, LLC, WAGBEAU )
LLC, WALGREEN MEDICAL SUPPLY, LLC )
WALGREEN MECANTILE CORPORATION, )
WALGREEN NATIONAL CORPORATION, )
WALGREEN REALTY RESOURCES LLC, )
WALGREENS BUSINESS SERVICES, LLC, )
WALGREENS HOME CARE, INC., )
WALGREENS MAIL SERVICE, INC., )
WALGREENS PHARMACY SERVICES )
EASTERN, LLC, WALGREENS PHARMACY )
SERVICES MIDWEST, LLC, WALGREENS )
PHARMACY SERVICES SOUTHERN, LLC, )

```
WALGREENS PHARMACY SERVICES          )
WESTERN, LLC, WALGREENS PHARMACY     )
SERVICES WHS, LLC, WALGREENS         )
PHARMACY STRATEGIES, LLC, WALGREENS)
STORE NO. 3680, LLC, WALGREENS       )
STORE NO. 7839, LLC, WALGREENS.COM,)
INC., SALIENT BUSINESS SOLUTIONS,  )
LTD., CHDM, LLC, WALGREENS-OPTION  )
CARE, INC., WALGREEN LOUISIANA CO.,)
INC., FULL ROAD HOLDINGS, LTD.,      )
WALGREEN HASTINGS CO., HOME HEALTH )
OF OPTION CARE, INC., WALGREEN OF  )
NEVADA, LLC, HUNTERDON INFUSION      )
SERVICES, L.L.C., TRINITY HOME       )
CARE, LLC, CORPORATE HEALTH          )
DIMENSIONS, INC., DUANE READE,       )
OPTION CARE OF NEW YORK, INC.,       )
SPRINGVILLE PHARMACY INFUSION        )
THERAPY, INC., WALGREEN EASTERN      )
CO., INC., WALGREENS STORE NO.       )
3288, LLC, OPTION HOME HEALTH, INC.)
UNIVERSITY OPTION CARE, LLC,         )
MEDCENTER, INC., OPTION CARE AT      )
LEGACY, LLC, OPTION CARE             )
ENTERPRISES, INC., WALGREEN OF       )
PUERTO RICO, INC., WALGREEN OF       )
SAN PATRICIO, INC., WALGREENS        )
INFUSION AND RESPIRATORY SERVICES, )
LLC, CORINTHIAN CARE GROUP, LLC,     )
VISION DIRECT INC., GREEN HILLS      )
INSURANCE COMPANY, A RISK REDUCTION)
GROUP, LCA INSURANCE CO., INC.,      )
OPTION CARE HOME HEALTH, L.L.C.,     )
WALGREEN OSHKOSH, INC., ALL          )
Subsidiaries and Retail Pharmacies,)
and  John Does 1 - 26,000            )
```

Defendants.

---

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.  JAMES HUGH POTTS II ("Relator") brings this action on

behalf of the UNITED STATES OF AMERICA against WALGREENS

CO, all of WALGREENS CO's pharmacies and subsidiaries, and John Does 1 through 26,000 (hereafter "Defendants").

2. Relator sues Defendants for treble damages and civil penalties arising from the Defendants' conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"). The violations arise out of requests for payment by Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Benefits Program and other government agencies and programs (hereinafter, collectively the "Government Healthcare Programs") based on false claims.

3. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $10,000 for each such claim submitted or paid, plus three times the amount of damages sustained by the Government. Liability attaches both when a defendant knowingly seeks payment that is unwarranted from the Government and when false records or statements are knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit money to the Government. The FCA is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. See S. Rep. No. 345, 99 Cong., 2nd Sess. At 2 (1986) reprinted in 1986 U.S.C.C.A.N.

4

5266. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself ("the relator") and for the Government and to share in any recovery. The Complaint is filed under seal for 60 days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

4. Based on those provisions, plaintiff/relator seeks to recover damages and civil penalties arising from defendants' presentation of false records, claims and statements to the Unites States Government and its agents in connection with defendants' claims for reimbursement for services provided to patients under the Medicare, Medicaid and CHAMPUS programs.

5. Plaintiff/relator also brings this action on behalf of the states of: Georgia, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, New Hampshire, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Wisconsin, the Commonwealth of Virginia and the District of Columbia.

## II. **JURISDICTION AND VENUE**

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 et seq. and 3730.

7. The acts proscribed by 31 U.S.C. § 3729 et seq. and complained of herein occurred in part in the Northern District of Georgia, and Defendants, Walgreens #6208, #6209, #6897 and #9271, among others, do business in the Northern District of Georgia. Therefore, this Court has jurisdiction over this case and all Defendants pursuant to 31 U.S.C. § 3732(a), as well as under 28 U.S.C. § 1345. This Court has pendent jurisdiction over this case for the claims brought on behalf of the states (referenced in paragraph 5) pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery is sought on behalf of said state which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

8. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. § 3729 et seq. and also proper pursuant to U.S.C. § 1391(b) because the claims that this Complaint describes arose in this district. Further, some of the Defendants and the

6

corporate parent of all of the Defendants do business in this District.

### III. **PARTIES**

9. Plaintiff and Relator, James Hugh Potts II, is a citizen and resident of Georgia. Mr. Potts resides at 1348 Ponce de Leon Ave. NE, Atlanta, Georgia 30306. Mr. Potts is a trial lawyer and owns James Hugh Potts II, L.L.C. in Atlanta, Georgia. Mr. Potts brings this action for violations of 31 U.S.C. §§ 3729 et seq. on behalf of himself and the United States Government pursuant to § 3730(b)(1). Mr. Potts has personal knowledge of the health quality fraud and false records, statements and claims presented to the Government by and for the defendants named herein. Mr. Potts discovered a systemic fraudulent practice by Defendants. Mr. Potts further brings this action for violations of the following state false claims acts: Georgia State False Medicaid Claims Act, GA. CODE ANN. § 49-4-168; California False Claims Act, CA. CODE ANN. §§ 12650-1265; Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 to 25.5-4-310; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201-1209; Florida False Claims Act, Fla. Stat. Ann. §§ 68.081-68.092;

Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1-8; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 438; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12, §§ 5-50, 5B; Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601-400.612; Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq.; Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010-357.250; New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 through 2A:32C-15; New Mexico Medicaid False Claims Act, §§ 27-14-1 to 27-14-15; New Mexico Fraud Against Taxpayers Act, §§ 44-9-1 to 44-9-14; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63. §§ 5053-5053.7; Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to 4-18-108; Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132; and the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19.

10. Defendant. WALGREENS CO, INC. (hereafter "WALGREENS") is a corporation organized and existing under the laws of Illinois, and has its principle place of business in the state of Illinois and is headquartered at 200 Wilmot Road, Deerfield, Illinois, 60015. Walgreens CO is a citizen of the state of Illinois. Walgreens CO, Inc. may be served

with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703. Walgreens Co, Inc., together with its subsidiaries, operates the largest chain of retail pharmacies in the United States with net sales of $72.2 billion in the fiscal year ending 31 August 2011. Walgreens sells prescription and non-prescription drugs in addition to general merchandise. Walgreens pharmacy, health and wellness services include retail, specialty, infusion and respiratory services, mail service, convenient care clinics and worksite clinics. An allegation against any Defendant herein is intended to include Walgreens Co., Inc. as a responsible party, inasmuch as Walgreens Co., Inc. is the parent company integrally involved in each of the Defendant pharmacy's operations.

11. Defendant. WALGREEN ARIZONA DRUG CO. is a corporation organized and existing under the laws of the state of Arizona and has its principal place of business in the state of Arizona. Walgreen Arizona Drug Co. is a citizen of the state of Arizona and subsidiary or Walgreen Hastings Co., a Nebraska corporation. Walgreen Arizona Drug Co. may be served with summons and a copy of this Complaint by

9

serving its registered agent, PRENTICE-HALL CORP SYSTEM, 2338 W. Royal Rd., STE-J, Phoenix, Arizona 85021.

12. Defendant. OPTION CARE, INC. is a corporation organized and existing under the laws of the state of California with its principal place of business in the state of Illinois. Option Care, Inc. is a citizen of the state of California and a subsidiary of Walgreens Infusion Services, Inc., a Delaware corporation. Option Care, Inc. may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company D/B/A Lawyers Incorporating Service, 2710 Gateway Oaks Dr. STE 150N, Sacramento, California 95833.

13. Defendant. AMERICAN OCCUPATIONAL HEALTH MANAGEMENT, INC. is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in the state of New York. American Occupational Health Management, Inc. is a citizen of the state of Delaware and a subsidiary of Take Care Employer Solutions, LLC, a Delaware limited liability company. American Occupational Health Management, Inc. may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, Delaware 19808.

14. Defendant.   BEAUTY.COM,   INC.   is   a   subsidiary   of Drugtore.com,   Inc.   Beauty.com,   Inc.   may   be   served   with summons   and   a   copy   of   this   Complaint   by   serving   its registered   agent,   Corporation   Service   Company,   2711 Centerville Road Suite 400, Wilmington, Delaware 19808.

15. Defendant.   DEPENDICARE   HOME   HEALTH,   L.L.C.   (a Delaware limited liability company and subsidiary of Option Care   Enterprises,   Inc.,   a   Delaware   Corporation)   may   be served with summons and a copy of this Complaint by serving its   registered   agent,   The   Corporation   Trust   Company, Corporation   Trust   Center,   1209   Orange   Street,   Wilmington, DE 19801.

16. Defendant.   DR   EMPLOYEE   SERVICES,   LLC   (a   Delaware limited   liability   company,   a   subsidiary   of   Duane   Reade, Inc.,   a   New   York   General   Partnership)   may   be   served   with summons   and   a   copy   of   this   Complaint   by   serving   its registered   agent,   Corporation   Service   Company,   2711 Centerville Road, Suite 400, Wilmington, DE 19808.

17. Defendant.   DRUGSTORE.COM,   INC.   (a   Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, The Corporation Trust   Company,   Corporation   Trust   Center,   1209   Orange Street, Wilmington, DE 19801.

18. Defendant.   DRI I INC. (a Delaware corporation and subsidiary of Duane Reade, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, The Prentice-Hall Corporation System, Inc., 2711 Centerville Road Suite 400, Wilmington, DE 19808.

19. Defendant.   DS PHARMACY, INC. (a Delaware corporation and   subsidiary   of   drugstore.com,   Inc.,   a   Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, The Corporation Trust Company, The Prentice-Hall Corporation System, Inc., 2711 Centerville Road Suite 400, Wilmington, DE 19808.

20. Defendant.   DUANE READE, INC. (a Delaware corporation and subsidiary of Duane Reade Holdings, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service   Company,   2711   Centerville   Road,   Suite   400, Wilmington, DE 19808.

21. Defendant.   DUANE READE HOLDINGS, INC. (a Delaware corporation and direct parent to Duane Reade, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

22. Defendant.   DUANE READE INTERNATIONAL, LLC (a Delaware limited liability company and subsidiary of Duane Reade, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

23. Defendant.   DUANE READE REALTY, INC. (a Delaware corporation and subsidiary of Duane Reade, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

24. Defendant.   FIRST RX SPECIALTY AND MAIL SERVICES, LLC (a Delaware limited liability company, 25% owned by Walgreen Co., Inc., an Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

25. Defendant.   HAPPY HARRY'S INC. (a Delaware corporation and direct parent to HHDC, Corp., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

26. Defendant.   HAPPY HARRY'S DISCOUNT DRUG STORES, INC. (a Delaware corporation and direct parent of Happy Harry's Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

27. Defendant.   HHDH, CORP. (a Delaware corporation and subsidiary of Happy Harry's Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

28. Defendant.   I-TRAX HEALTH MANAGEMENT SOLUTIONS, INC. (a Delaware corporation and subsidiary of Take Care Health Systems, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

29. Defendant. LAUREL MOUNTAIN MEDICAL SUPPLY, LLC (a Delaware limited liability company and subsidiary of Mosso's Medical Supply Company, LLC, a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

**14**

30. Defendant. RAD ONLINE SALES, INC. (a Delaware corporation and subsidiary of drugstore.com, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

31. Defendant. SALU BEAUTY, INC. (a Delaware corporation and subsidiary of drugstore.com, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

32. Defendant. WALGREENS ASSISTANCE, INC. (a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

33. Defendant. WALGREENS NETWORK HEALTH SERVICES, LLC (a Delaware limited liability company and subsidiary of Walgreens Long-Term Care Pharmacy, LLC, and Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

34. Defendant. WALGREENS SPECIALTY PHARMACY HOLDINGS, INC. (a Delaware corporation and direct parent of Walgreens Specialty Pharmacy, LLC, a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

35. Defendant. WALGREENS SPECIALTY PHARMACY, LLC (a Delaware limited liability company and subsidiary of Walgreens Specialty Pharmacy Holdings, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

36. Defendant. WVC INVESTMENTS, LLC (a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

37. Defendant. MEDNOW INFUSION, LLC (a Delaware limited liability company, 51% owned by Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered

**16**

agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

38. Defendant. MERIDIAN COMP OF NEW YORK, INC. (a Delaware corporation and subsidiary of Take Care Employer Solutions, LLC, a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

39. Defendant. MOSSO'S MEDICAL SUPPLY COMPANY, LLC (a Delaware limited liability company and subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

40. Defendant. OPTION CARE ENTERPRISES, INC. (a Delaware corporation and subsidiary of Walgreens Infusions Services, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

41. Defendant. OPTION CARE HOME HEALTH, L.L.C. (a Delaware limited liability company and subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its

**17**

registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

42. Defendant. WALGREENS INFUSION SERVICES, INC. (a Delaware corporation and direct parent to Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

43. Defendant. OPTIONET, INC. (a Delaware corporation and subsidiary of Walgreens Infusion Services, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

44. Defendant. WALGREENS SPECIALTY CARE CENTERS, LLC (a Delaware limited liability company and direct subsidiary of Walgreens Specialty Pharmacy, LLC, a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

45. Defendant. TAKE CARE EMPLOYER SOLUTIONS, LLC (a Delaware limited liability company and subsidiary of Take Care Health Systems, Inc., a Delaware corporation) may be

**18**

served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

46. Defendant. TAKE CARE HEALTH SYSTEMS, INC. (a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

47. Defendant. TAKE CARE HEALTH SYSTEMS, LLC (a Delaware limited liability company and direct subsidiary of Take Care Health Systems, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

48. Defendant.   ULTRACARE, LLC (a Delaware limited liability company and subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

49. Defendant. WALGREENS VENTURE CAPITAL, LLC (a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent,

**19**

Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

50. Defendant.   WALGREENS STORE NO. 3332, LLC (a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

51. Defendant.   WALGREENS STORE NO. 4650, LLC (a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

52. Defendant.   WALGREENS STORE NO. 4651, LLC (a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

53. Defendant.   WALGREENS STORE NO. 5576, LLC (a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

54. Defendant.   WALGREENS STORE NO. 5838, LLC (a Delaware limited liability company) may be served with summons and a

copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

55. Defendant.   WALTRUST   PROPERTIES,   INC.   (a   Delaware corporation   and   subsidiary   of   Bond   Drug   Company   of Illinois, LLC, an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2711 Centerville Road Suite 400, Wilmington, DE 19808.

56. Defendant.   WHOLE HEALTH MANAGEMENT, LLC (a Delaware limited   liability   company   and   direct   subsidiary   of   Take Care Health Systems, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its   registered   agent,   Corporation   Service   Company,   2711 Centerville Road Suite 400, Wilmington, DE 19808.

57. Defendant. WALGREEN OF HAWAII, LLC (a Hawaii limited liability company) may be served with summons and a copy of this   Complaint   by   serving   its   registered   agent,   CSC Services of Hawaii, Inc., 1600 Pauahi Tower, 1003 Bishop St., Honolulu, Hawaii 96813.

58. Defendant.   WALGREEN   OF   MAUI,   INC.   (a   Hawaii corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Robert A. Ueoka, 999 Bishop Street Suite 2600, Honolulu, Hawaii 96813.

59. Defendant. BOND DRUG COMPANY OF ILLINOIS, LLC (an Illinois limited liability company and subsidiary of Walgreen Eastern Co., an Illinois LLC) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

60. Defendant. BOWEN DEVELOPMENT COMPANY (an Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

61. Defendant. DEERFIELD FUNDING CORPORATION (an Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

62. Defendant. EAST-WEST DISTRIBUTING CO. (an Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

63. Defendant. MEDICATION ADHERENCE SOLUTIONS, LLC (formerly WALGREENS LONG-TERM CARE PHARMACY, LLC, an Illinois limited liability company) may be served with

22

summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

64. Defendant. THE 1901 GROUP, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

65. Defendant. WAGBEAU, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

66. Defendant. WALGREEN MEDICAL SUPPLY, LLC (an Illinois limited liability company and subsidiary of Walgreens Mail Service, Inc., and Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

67. Defendant. WALGREEN MERCANTILE CORPORATION (an Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

**23**

68. Defendant. WALGREEN NATIONAL CORPORATION (an Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

69. Defendant. WALGREEN REALTY RESOURCES LLC (an Illinois limited liability company and direct parent of Walgreen Market Strategies LLC, and Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

70. Defendant. WALGREENS BUSINESS SERVICES, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

71. Defendant. WALGREENS HOME CARE, INC. (an Illinois corporation and subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

72. Defendant. WALGREENS MAIL SERVICE, INC. (an Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

73. Defendant. WALGREEN PHARMACY SERVICES EASTERN, LLC (an Illinois limited liability company and subsidiary of Walgreen Pharmacy Services Midwest, LLC, an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

74. Defendant. WALGREEN PHARMACY SERVICES MIDWEST, LLC (an Illinois limited liability company, 97% owned by Bond Drug Company of Illinois, LLC, and Illinois limited liability company; 2% owned by Walgreens Louisiana Co., Inc., a Louisiana corporation; 1% owned by Happy Harry's, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

75. Defendant. WALGREEN PHARMACY SERVICES SOUTHERN, LLC (an Illinois limited liability company and subsidiary of Walgreen Pharmacy Services Midwest, LLC, an Illinois

25

limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

76. Defendant. WALGREEN PHARMACY SERVICES WESTERN, LLC (an Illinois limited liability company and subsidiary of Walgreen Pharmacy Services Midwest, LLC, an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

77. Defendant. WALGREEN PHARMACY SERVICES WHS, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

78. Defendant. WALGREENS PHARMACY STRATEGIES, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

79. Defendant. WALGREENS PHARMACY STRATEGIES, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its

26

registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

80. Defendant.  WALGREENS STORE NO. 3680, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

81. Defendant.  WALGREENS STORE NO. 7839, LLC (an Illinois limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

82. Defendant.      WALGREENS.COM,    INC.    (an    Illinois corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

83. Defendant.  CHDM, LLC (an Indiana limited liability company, 99% owned by Medicenter, Inc., an Oklahoma corporation; 1% owned by Corporate Health Dimensions, Inc., a New York corporation) with its business located in Franklin, Tennessee, may be served with summons and a copy of this Complaint by serving its registered agent,

27

Corporation Service Company, 251 E. Ohio Street Suite 500, Indianapolis, Indiana 46204.

84. Defendant. WALGREENS-OPTION CARE, INC. (a Kentucky corporation and subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, CSC-Lawyers Incorporating Service Company, 421 West Main Street, Frankfort, Kentucky 40601.

85. Defendant. WALGREEN LOUISIANA CO., INC. (a Louisiana corporation) may be served with summons and a copy of this Complaint by serving its registered agent, The Prentice-Hall Corporation System, Inc., 320 Somerulos Street, Baton Rouge, Louisiana 70802-6129.

86. Defendant. WALGREEN HASTINGS CO. (a Nebraska corporation and a direct parent of Walgreen Arizona Drug Co.) may be served with summons and a copy of this Complaint by serving its registered agent, The Prentice-Hall Corporation System, Inc., Suite 1900, 233 South 13th Street, Lincoln, Nebraska 68508.

87. Defendant. HOME HEALTH OF OPTION CARE, INC. (a Nevada corporation and a subsidiary of Walgreens Infusion Services, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its

registered agent, CSC Services of Nevada, Inc., 2215-B Renaissance Dr., Las Vegas, Nevada 89119.

88. Defendant.   WALGREEN OF NEVADA, L.L.C. (a Nevada limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, CSC Services of Nevada, Inc., 2215-B Renaissance Dr., Las Vegas, Nevada 89119.

89. Defendant.   WALGREEN OF NEVADA, L.L.C. (a Nevada limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, CSC Services of Nevada, Inc., 2215-B Renaissance Dr., Las Vegas, Nevada 89119.

90. Defendant.   HUNTERDON INFUSION SERVICES, L.L.C. (a New Jersey limited liability company, 50% owned by Option Care Enterprises, Inc., a Pennsylvania corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 830 Bear Tavern Road, Trenton, New Jersey 08628.

91. Defendant.   TRINITY HOME CARE, LLC (a New Jersey limited liability company, a direct subsidiary of Option Care of New York, Inc., a New York corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 830 Bear Tavern Road, Trenton, New Jersey 08628.

92. Defendant.   CORPORATE HEALTH DIMENSIONS, INC. (a New York corporation, a subsidiary of Take Care Employer Solutions, LLC, a Delaware limited liability company) may be served with summons and a copy of this Complaint by serving its registered agent, Corporate Service Company, 80 State Street, Albany, New York, 12207-2543.

93. Defendant.   DUANE   READE   (a   New   York   General Partnership, 99% owned by Duane Reade, Inc., a Delaware corporation,   1%   owned   by   DRI-I,   Inc.,   a   Delaware corporation) may be served with summons and a copy of this Complaint by serving Duane Reade, Inc.'s registered agent, Corporate Service Company, 80 State Street, Albany, New York, 12207-2543.

94. Defendant.   OPTION CARE OF NEW YORK, INC. (a New York corporation, a subsidiary of Walgreens Infusion Services, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporate Service Company, 80 State Street, Albany, New York, 12207-2543.

95. Defendant.   SPRINGVILLE PHARMACY INFUSION THERAPY, INC. (a New York corporation, a subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its

registered agent, Corporate Service Company, 80 State Street, Albany, New York, 12207-2543.

96. Defendant. **WALGREEN EASTERN CO., INC.** (a New York corporation, a subsidiary of Walgreen Arizona Drug Co., an Arizona corporation) may be served with summons and a copy of this Complaint by serving its registered agent, The Prentice-Hall Corporation System, Inc., 80 State Street, Albany, New York, 12207.

97. Defendant. **WALGREENS STORE NO. 3288, LLC** (a New York limited liability company, a subsidiary of Walgreen Eastern Co., Inc., a New York corporation) may be served with summons and a copy of this Complaint by serving Corporation Service Company, 80 State Street, Albany, New York, 12207-2543.

98. Defendant. **OPTION HOME HEALTH, INC.** (an Ohio corporation, a subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, CSC-Lawyers Incorporating Service (Corporation Service Company), 50 W. Broad Street Suite 1800, Columbus, Ohio 43215.

99. Defendant. **UNIVERSITY OPTION CARE, LLC** (an Ohio limited liability company, 50% owned by Option Care Enterprises, Inc., a Delaware corporation) may be served

31

with summons and a copy of this Complaint by serving its registered agent, CSC-Lawyers Incorporating Service (Corporation Service Company), 50 W. Broad Street Suite 1800, Columbus, Ohio 43215.

100.    Defendant.    MEDICENTER, INC. (an Oklahoma corporation, a subsidiary of Take Care Employer Solutions, LLC, a Delaware LLC) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 115 SW 89th Street, Oklahoma City, Oklahoma 73139.

101.    Defendant. OPTION CARE AT LEGACY, LLC (an Oregon limited liability company, 50% owned by Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 285 Liberty Street NE, Salem, Oregon 97301.

102.    Defendant. OPTION CARE ENTERPRISES, INC. (a Pennsylvania corporation, a subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2595 Interstate Drive Suite 103, Harrisburg, Pennsylvania 17110.

103.    Defendant. WALGREEN OF PUERTO RICO, INC. (a Puerto Rico corporation) may be served with summons and a

32

copy of this Complaint by serving its registered agent, Prentice Hall Corporation System Puerto Rico, Inc., BBVA Tower Suite Pl, 254 Muñoz Rivera Ave., San Juan, Puerto Rico 00918.

104.   Defendant.   WALGREEN OF SAN PATRICIO, INC. (a Puerto Rico corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Prentice Hall Corporation System Puerto Rico, Inc., BBVA Tower Suite Pl, 254 Muñoz Rivera Ave., San Juan, Puerto Rico 00918.

105.   Defendant.   WALGREENS INFUSION AND RESPIRATORY SERVICES, LLC (a Tennessee limited liability company, 50% owned by Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 2908 Poston Ave., Nashville, Tennessee 37203-1312.

106.   Defendant. CORINTHIAN CARE GROUP, LLC (a Texas limited liability company, a subsidiary of Option Care Enterprises, Inc., a Delaware corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

107.    Defendant.   VISION   DIRECT,   INC.   (a   Texas corporation,   a   subsidiary   of   drugstore.com,   Inc.,   a Delaware corporation) may be served with summons and a copy of   this   Complaint   by   serving   its   registered   agent, Corporation Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701.

108.    Defendant. GREEN HILLS INSURANCE COMPANY, A RISK RETENTION GROUP (a Vermont corporation, 99.96% owned by Take Care Employer Solutions, LLC, a Delaware limited liability company; and 0.01% owned by Take Care Health Systems, Inc., a Delaware corporation) may be served with summons   and   a   copy   of   this   Complaint   by   serving   its registered agent, Paul Frank & Collins, 1 Church St., Burlington, Vermont 05401.

109.    Defendant. LCA INSURANCE CO., INC. (a Vermont corporation) may be served with summons and a copy of this Complaint by serving its registered agent, Paul Frank & Collins P.C., One Church St., Burlington, Vermont 05401.

110.    Defendant. OPTION CARE HOME HEALTH, L.L.C. (a Washington limited liability company, 50% owned by Option Care Enterprises, Inc., a Delaware corporation; and 50% owned by Option Care, Inc., a California corporation) may be   served   with   summons   and   a   copy   of   this   Complaint   by

serving its registered agent, Corporation Service Company, 300 Deschutes Way SW Suite 304, Tumwater, Washington 98501.

111.    Defendant. WALGREEN OSHKOSH, INC. (a Wisconsin corporation) may be served with summons and a copy of this Complaint by serving its registered agent, The Prentice-Hall Corporation System, Inc., 8040 Excelsior Drive Suite 400, Madison, Wisconsin 53717.

112.    Defendants.    John   Does   1   through   26,000, including but not limited to pharmacists, employed or who provide services through Walgreens Co. or any of its subsidiaries as above.

113.    All   of   the   above   listed   defendants   are collectively referred to as "Defendants" hereafter.

### IV.    **FEDERAL HEALTHCARE PROGRAMS**

114.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. § 1395 to 1395ccc.  There are two general components to the Medicare program, Part A and Part B.

115.    The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et

35

seq., is a system of medical assistance for indigent individuals. Though federally created, the Medicaid program is a joint federal-state program in which the United States provides a significant share of the funding for the program.

116. TRICARE Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by Uniformed Services beneficiaries, including retirees, their dependents and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TriCare contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

117. CHAMPVA is a health benefits program in which the Department of Veterans Affairs ("VA") shares the cost of certain health care services and supplies with eligible beneficiaries, including prescription drugs. 38 U.S.C. § 1781. CHAMPVA is managed by the VA's Health Administration Center in Denver, Colorado. Eligible CHAMPVA beneficiaries may receive their prescriptions in the network of SXC Health Solutions, Inc. pharmacies.

## V.   **ALLEGATIONS**

118.    Defendants are all participants in federally funded health care programs including Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Health Benefits Program and other Governmental programs.

119.    Defendants provide prescription drug services for beneficiaries of Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Health Benefits Program and other Governmental programs.

120.    Walgreen Co., together with its subsidiaries, operates the largest drugstore chain in the United States with 8,210 locations in 50 states, the District of Columbia, Puerto Rico and Guam as of 2011.

121.    Defendants offer products and services through retail drugstores, as well as through mail, by telephone and through the Internet.

122.    Defendants have captured *20% of the market share of U.S. retail prescription sales* in 2011 filling approximately 718 million prescriptions (*819 million 30-day equivalents filled in 2011*, up from 778 million in 2010 and 723 million in 2009). (See Walgreens' 2011 10-K, Available at:

http://news.walgreens.com/images/20007/10k2011.pdf).

123.   Prescription sales accounted for 64.7% of Defendants' sales in 2011, while non-prescription drugs accounted for 10% of sales.

124.   Defendants' net earnings increased 29.8% to $2.7 billion in 2011.

125.   Since 2007 Defendants' **net sales have steadily increased over 34%**: $53.76 billion in 2007, $$59.03 billion in 2008, $63.33 billion in 2009, $67.42 billion in 2010 and **$72.184 billion in 2011**.

126.   **Medicare and Medicaid** payments comprise approximately 36% of the outpatient prescription sales market, roughly **$17 billion** of Defendants' 2011 prescription drug sales.

127.   Relator alleges that payments to Defendants were conditioned upon compliance with 42 U.S.C. § 1396r-8(g)(2)(A)(i), 42 U.S.C. § 1396r-8(g)(2)(A)(ii)(I) and each state statute and regulation promulgated pursuant to 42 U.S.C. § 1396r-8.

128.   Relator alleges that Defendants' violation of 42 U.S.C. § 1396r-8(g)(2)(A)(i), 42 U.S.C. § 1396r-8(g)(2)(A)(ii)(I) and each state statute and regulation promulgated pursuant to 42 U.S.C. § 1396r-8 is material to the government's decision to pay out money to Defendants.

129.    Relator    alleges    that    Defendants    knowingly
presented  each  and  every  false  or  fraudulent  claim  for
payment  despite  Defendants'  knowing  failure  to  comply  with
and  in  violation  of  42  U.S.C.  §  1396r-8(g)(2)(A)(i),  42
U.S.C.  §  1396r-8(g)(2)(A)(ii)(I)  and  each  state  statute  and
regulation  promulgated  pursuant  to  42  U.S.C.  §  1396r-8  is
material  to  the  government's  decision  to  pay  out  money  to
Defendants.

### STATUTORY MANDATES FOR PHARMACISTS DISPENSING PRESCRIPTIONS

#### A. LEGISLATIVE HISTORY AND MEDICARE

130.    Congress    contended    with    concerns    regarding
"striking  a  balance  between  a  comprehensive  benefit  and
economic  viability"  for  extending  Medicare  prescription
drug  coverage.   The  issues  and  concerns  policymakers  have
dealt  with  since  1967  "included  (1)  drug  prices,  (2)
formularies,  (3)  *drug  utilization  review*  (*to  ensure  the
appropriateness  of  prescriptions  for  the  patient's
condition,  to  reduce  unnecessary  care,  and  to  promote  cost-
effectiveness*,  (4)  consumer  cost  sharing,  and  (5)
reimbursement  of  pharmacists."  (Exhibit  1,  Pages  283  and
294).

131.    The  Medicare  Catastrophic  Coverage  Act  of  1988
(P.L.  100-360),  which  was  repealed  in  1989,  included

provisions to limit financial risk through reimbursement for prescription medications and to reduce the risk of adverse drug reactions through drug utilization review.

132.    The Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"), P.L. 108-173, was enacted 8 December 2003 and went into effect in 2006 creating a subsidy program to certain employer, union and other group plans that provide retiree coverage to Medicare Part D eligible individuals and significantly expanding Medicare coverage for outpatient prescriptions.  Before the MMA, a limited number of drugs were provided to Medicare beneficiaries under Parts A and B.

**B. MEDICAID AND LEGISLATIVE MANDATE COVERING ALL CONSUMERS**

133.    In response to rising Medicaid expenditures for health care, Congress included provisions in the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90") to "assure that prescriptions (i) are *appropriate*, (ii) are *medically necessary*, and (iii) are *not likely to result in adverse medical results."* 42 USCA 1396r-8(g)(1)(A).

134.    OBRA 90 was enacted 5 November 1990 and the pharmacy practice mandates went into effect on 1 January 1993.

135.    OBRA 90 mandated that States participating in Medicaid provide for a prospective drug review. 42 USCA 1396r-8(g)(2)(A)(i).

136.    "[T]he review **_shall_** include screening for potential drug therapy problems due to

    a. **therapeutic duplication,**

    b. **drug-disease contraindications,**

    c. **drug-drug interactions (including serious interactions with nonprescription or over-the-counter drugs),**

    d. **incorrect drug dosage or**

    e. **duration of drug treatment,**

    f. **drug-allergy interactions,** and

    g. **clinical abuse/misuse.**" 42 U.S.C. § 1396r-8(g)(2)(A)(i).

137.    OBRA 90 also mandated the States participating in Medicaid to "establish standards for counseling of individuals receiving benefits . . . by pharmacists." 42 U.S.C. § 1396r-8(g)(2)(A)(ii).

138.    "The **_pharmacist_** **_must_** offer to discuss with each individual who presents a prescription, matters which in the exercise of the pharmacist's professional judgment, the pharmacist deems significant including the following: . . . **common severe side or adverse effects** or **interactions** and

41

therapeutic contraindications that may be encountered, including their avoidance, and the action required if they occur." 42 U.S.C. § 1396r-8(g)(2)(A)(ii)(I).

139.    **Every state has enacted legislation, regulations, or both**, based on the OBRA 90 mandate to comply with its requirements, which not only **mandate the duties set forth in OBRA 90 for Medicaid recipients, but also mandate those duties for all consumers/patients**.

## EXAMPLES OF STATE STATUTES AND REGULATIONS
### GEORGIA

140.    "A **pharmacist shall** review the patient record and each prescription drug order presented for dispensing for the purposes of promoting therapeutic appropriateness by identifying:

    (1) **Overutilization** or **underutilization**;

    (2) **Therapeutic duplications**;

    (3) **Drug-disease contraindications**;

    (4) **Drug-drug interactions**;

    (5) **Incorrect drug dosage, dosage form**, or **duration of drug therapy**;

    (6) **Drug-allergy interactions**; and

    (7) **Clinical abuse or misuse**." O.C.G.A. § 26-4-84(b).

141.    "Upon recognizing any of the above situations, the **pharmacist shall** take appropriate steps to **avoid** or **resolve** the situation or problem **which shall, if necessary, include consultation with the prescribing practitioner.**" O.C.G.A. § 26-4-84(c).

> Upon receipt of a prescription drug order and **following a review of the patient's record,** the **pharmacist or the pharmacy intern operating under the direct supervision of the pharmacist shall personally offer to discuss matters which will enhance or optimize drug therapy with each patient or caregiver of such a patient.** Such discussion shall be in person, whenever practicable, or by telephone and shall include appropriate elements of patient counseling, based on the professional judgment of the pharmacist. Such elements may include but are not limited to the following: (1) The name and description of the drug; (2) The dosage form, dose, route of administration and duration of therapy; (3) The **intended use of the drug and expected action or result;** (4) Any **special directions or precautions** for preparation, administration, or use by the patient; (5) **Common severe side effects or adverse effects or interactions and therapeutic contraindications that may be encountered,** including their **avoidance,** and the **action required if such side effect, adverse effect, interaction,** or **therapeutic contraindication occurs;** (6) Techniques for self-monitoring of drug therapy; (7) The proper storage of the drug; (8) Prescription refill information; The action to be taken in the event of a missed dose, and (10) The **comments of the pharmacist relevant to the patient's drug therapy, including other information peculiar to the specific patient or drug.** O.C.G.A. § 26-4-85(b).

142.    "The **pharmacist shall make a reasonable effort to obtain from the patient or the patient's agent** and **shall record any known allergies, drug reactions, idiosyncrasies**, and **chronic conditions or disease states** of the patient and the **identity of any other drugs**, including **over-the counter drugs or devices currently being used by the patient which may relate to the prospective drug review**." Pharm. Reg. § 480-27-.09(2).


### CALIFORNIA

### Business and Professions Code 4000 et seq. Article 2. Pharmacies

143.    "***Prior to consultation*** as set forth in section 1707.2, **a _pharmacist shall_ review a patient's drug therapy and medication record before each prescription drug is delivered.  _The review shall include screening for severe potential drug therapy problems_**." (1707.3).

144.    "A pharmacist shall provide oral consultation to his or her patient or the patient's agent in all care settings:

> (1)   upon request; or

> (2)   whenever the pharmacist deems it warranted in the exercise of his or her professional judgment."

**44**

(1707.2(a)(1) and (2)).

145.    "A *pharmacist shall provide oral consultation* to his or her patient or the patient's agent *in any care setting in which the patient or agent is present: whenever the prescription drug has not previously been dispensed to a patient;* or whenever a prescription drug *not previously dispensed to a patient in the same dosage form, strength* or with the *same written directions,* is dispensed by the pharmacy." (1707.2(b)(1)(A) and (B)).

146.    "When the patient or agent is not present (including by not limited to a prescription drug that was shipped by mail) a *pharmacy shall ensure that the patient receives written notice: of his or her right to request consultation;* and a telephone number from which the patient may obtain oral consultation from a pharmacist who has ready access to the patient's record." (1707.2(b)(2)).

147.    "When oral consultation is provided, it shall include at the least the following: *precautions and relevant warnings,* including *common severe side or adverse effects or interactions that may be encountered* . . .." (1707.2(c)(2)).

148.    "Where a pharmacist deems it warranted in the exercise of his or her professional judgment, oral consultation shall also include: . . . therapeutic

**45**

contraindications, avoidance of common severe side or adverse effects or known interactions, including serious potential interactions with known nonprescription medications and therapeutic contraindications and the action required if such side or adverse effects or interactions or therapeutic contraindications are present or occur . . .." (1707.2(d)(6)).

## COLORADO

### 3 CCR 719-1 *et seq.*

149.    "'Initial interpretation' means the review of an order accompanied by order entry. The *pharmacist*(s) conducting the initial interpretation *shall be held accountable for* the *accuracy of the electronic order entry/ manual transcription* and for *appropriateness of therapy* (e.g. *known allergies, reasonable dose, duration of use,* and *route of administration, considering age, gender,* and *other patient factors; reasonable directions for use; potential or actual adverse drug reactions; drug-drug interactions; drug-food interactions; drug-disease contraindications; therapeutic duplication; proper utilization* (including *over- or under-utilization*) and *optimum therapeutic outcomes;* and *abuse/misuse*.)" (20.00.20).

46

150.     "**When refills are dispensed,** the **pharmacist conducting the final evaluation shall be held accountable for** the appropriate dispensing of refills including **all drug utilization reviews** as they pertain to refill dispensing." (3.00.50b).

151.     "Drug regimen review includes but is not limited to the evaluation of order(s) and patient record(s) for:

1) **Known allergies;**

2) **Rational therapy and contraindications;**

3) **Reasonable dose, duration of use, and route of administration** considering age, gender, and other patient factors;

4) **Reasonable directions for use;**

5) **Potential or actual adverse drug reactions;**

6) **Drug-drug interactions;**

7) **Drug-food interactions;**

8) **Drug-disease contraindications;**

9) **Therapeutic duplication;**

10) **Proper utilization** (including **over- or under-utilization**) and **optimum therapeutic outcomes;** and

11) **Abuse/misuse.**" (3.00.50c).

152.     "When the patient seeks advice, or when, in the pharmacist's professional judgment, the best interest of the patient will be served, the **pharmacist** shall offer to

**47**

advise the patient regarding the prescription." (1.00.18).

### CONNECTICUT

### Chapter 400j Sec. 20-570 *et seq.*

153.    "Prior to or simultaneously with dispensing a drug to an individual eligible for benefits in accordance with sections 17b-260 to 17b-262, inclusive, and 17b-264 to 17b-285, inclusive, a **pharmacist shall undertake a review** of drugs dispensed to the individual by the pharmacy during the previous one hundred eighty days. **The review shall include screening for potential drug therapy problems** due to **therapeutic duplication**, a **contraindication between a drug and a disease**, the **interaction of one drug with another, incorrect drug dosage or duration** of drug treatment, the **interaction of a drug and an allergy, clinical abuse or misuse** and **any other significant clinical issues relating to the appropriate use of drugs**." (Sec. 20-620(b)).

154.    "Prior to or simultaneous with dispensing drugs . . . a **pharmacist shall**, whenever practicable, **offer in person to discuss the drugs to be dispensed and to counsel the client on their usage**, except when the person obtaining the prescription is other than the person named on the prescription form or the pharmacist determines it is

**48**

appropriate to make such offer in writing. Any such written offer shall include an offer to communicate with the client either in person at the pharmacy or by telephone." (Sec. 20-620(c)).

155.    "The discussion and counseling offered in accordance with subsection (c) of this section shall include information deemed significant by the pharmacist based upon the findings of the review conducted in accordance with subsection (b) of this section, including . . . (3) special directions and precautions for preparation, administration and use by the patient; (4) common severe side or adverse effects or interactions and therapeutic contraindications or precautions which the pharmacist deems relevant; . . . and (8) action to be taken in the event of a missed dose or adverse reaction." (Sec. 20-620(d)).

### DELAWARE

#### Del. Admin. Code 2500 *et seq.*

156.    "The practice of dispensing shall include, but not be limited to the following acts which **shall be performed only by a pharmacist, or** a pharmacy intern or student participating in an approved College of Pharmacy coordinated, practical experience program **under the direct supervision of a pharmacist.**" (5.1).

157.     "**Before dispensing or delivering a new medication** to a patient or his or her agent, **a _pharmacist_ . . . shall conduct a prospective drug review.** A prospective drug review may be conducted before refilling a prescription to the extent deemed appropriate. A prospective drug review **shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, drug-disease contraindications,** if disease is known, **incorrect drug dosage or duration of drug treatment, drug-allergy interactions,** and **clinical abuse or misuse** based on available information received by the pharmacist." (5.1.5).

158.     "**A _pharmacist_ . . . shall, with each new medication dispensed, provide verbal counseling to the patient or the patient's agent on pertinent medication information.** The counseling may include, but not be limited to the following: (5.2.1)

5.2.1.6   **common severe side effects or adverse effects or interactions and therapeutic contraindications that may be encountered, how to avoid them, and what actions should be taken if they occur . . .."**

159.     "Pharmacy technicians and certified pharmacy technicians may carry out any pharmacy-related duty

assigned to them by their supervising pharmacist **except for those activities specifically excluded** by 24 Del.C. §§2507(b) and 2502(19)."

160.    "No person who has not been issued a certificate as a pharmacist . . . shall certify a prescription, **perform drug utilization reviews**, provide drug information requiring clinical or technical knowledge, **counsel patients**, receive new verbal prescription orders without recorded backup, or contact a prescriber concerning prescription drug order interpretation or therapy modification. (24 Del.C. §§2507(b)).

161.    ""Practice of pharmacy" means the interpreting, evaluating, and dispensing of a practitioner's or prescriber's order. The practice of pharmacy includes, but is not limited to, the proper compounding, labeling, packaging, and dispensing of a drug to a patient or the patient's agent, and administering a drug to a patient. The practice of pharmacy includes the application of the pharmacist's knowledge of pharmaceutics, pharmacology, pharmacokinetics, drug and food interactions, drug product selection, and patient counseling. It also includes:

> a. **Participation in drug utilization and/or drug regimen reviews**;

**51**

b. ***Participation in therapeutic drug selection,*** substitution of therapeutically equivalent drug products;

c. ***Advising practitioners*** and other health care professionals, ***as well as patients, regarding the total scope of drug therapy, so as to deliver the best care possible;***

d. ***Monitoring drug therapy;***

e. Performing and interpreting capillary blood tests to screen and monitor disease risk factors or facilitate patient education, the results of which must be reported to the patient's health care practitioner; screening results to be reported only if outside the normal limits;

f. Conducting or managing a pharmacy or other business establishment where drugs are compounded or dispensed . . .." (24 Del.C. §2502(19)).

### FLORIDA

#### Chapter 64B16-27 *et seq.*

162.    "***A pharmacist shall review the patient record and each new and refill prescription for dispensing*** in order to promote therapeutic appropriateness by identifying:

1. **Over-utilization or under-utilization**;

2. **Therapeutic duplication**;

3. **Drug-disease contraindications**;

4. **Drug-drug interactions**;

5. **Incorrect drug dosage or duration of drug treatment**;

6. **Drug-allergy interactions**; or

7. **Clinical abuse/misuse**.” (64B16-27.810(1)).

163.    “Upon receipt of a new or refill prescription, *the pharmacist shall ensure that a verbal and printed offer to counsel is made to the patient or the patient's agent* when present. If the delivery of the drugs to the patient or the patient's agent is not made at the pharmacy the offer shall be in writing and shall provide for toll-free telephone access to the pharmacist. If the patient does not refuse such counseling, *the pharmacist* . . . *shall review the patient's record and personally discuss matters which will enhance or optimize drug therapy with each patient or agent of such patient*. Such discussion shall be in person, whenever practicable, or by toll-free telephonic communication and shall include appropriate elements of patient counseling. Such elements may include, in the professional judgment of the pharmacist, the following:

.  .  . *Common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required if they occur* .  .  .." (64B16-27.820(1)(e)).

164.    "Registered *Pharmacy technicians* <u>shall not</u>:

(a)   Receive new verbal prescriptions or any change in the medication, strength or directions;

(b)   *Interpret a prescription or medication order for therapeutic acceptability and appropriateness;*

(c)   *Conduct a final verification of dosage and directions;*

(d)   *<u>Engage in prospective drug review</u>;*

(e)   *Provide patient counseling;*

(f)   *Monitor prescription usage;* and

(g)   *<u>Override clinical alerts without first notifying the pharmacist</u>.*" (64B16-27.420(2)).

## HAWAII

### Hawaii Admin. Rules Title 16 Chapter 95

165.    In order for a pharmacy to advertise that it performs the service of utilizing a personal medication record a "system must be maintained which enables the immediate retrieval of information concerning individual

**54**

pharmacy patients which is of sufficient scope to enable a determination by the pharmacist of rational drug utilization.  In accomplishing this purpose the design and use of the system must be to ascertain and record all patient information necessary to assist the pharmacist in avoiding *adverse drug reactions, drug-drug interactions, and inappropriate use of drugs.*" (§16-95-102(1)).

### ILLINOIS

**Admin. Code Title 68(b), Part 1330 et seq.**

166.    "*Upon receipt of a new or refill prescription, a prospective drug regimen review or drug utilization evaluation shall be performed.*" (1330.700(a)).

167.    "An *offer to counsel shall be made on all prescriptions*.  If the offer to counsel is accepted, the *pharmacist or the student pharmacist, as directed and supervised by the pharmacist, shall counsel the patient or patient's agent using his or her professional judgment.*" (1330.700(a)).

168.    "Counseling shall include, but is not limited to: . . . Common severe side effects, adverse effects, or interactions and therapeutic contraindications that may be encountered, including their avoidance and the action required if they occur." (1330.700(a)(10)).

55

169.     "The **pharmacist is responsible for maintaining patient profiles . . .. A reasonable effort shall be made to obtain information**, including, but not limited to, the following:   .   .   . **Individual history**, when significant, including **disease state, known allergies, drug interactions**, and a **comprehensive list of medications and relevant devices; and Pharmacist's comments relevant to the individual's therapy**."   (1330.700(c)(2) and (3)).

### INDIANA

### Title 856, Authority IC 25-26 et seq.

170.     "'Quality-related event" means the inappropriate provision of pharmaceutical services whether or not resulting in an adverse health incident, including . . .

(B) A failure to identify and manage:

(i)        **overutilization or underutilization;**

(ii)       **therapeutic duplication;**

(iii)      **drug-disease contraindications;**

(iv)      **drug-drug interactions;**

(v)       **incorrect drug dosage or duration of therapy;**

56

(vi)      **drug-allergy interactions**; or

(vii)     **clinical abuse and/or misuse.**" (856 IAC
          1-28.1-1(12)).

171.     "Upon the receipt of a prescription or upon the
subsequent refilling of a prescription, and *following a
review of the patient's prescription medication profile*,
the *pharmacist shall be responsible for the initiation of
an offer*, as set forth in section 1.5(a) of this rule, to
counsel the patient on matters that, in the pharmacist's
professional judgment, are significant to optimizing drug
therapy. Depending upon the situation, these matters may
include, but are not necessarily limited to, the following:

.  .  . (4) *Common adverse effects or interactions and
therapeutic contraindications that may be encountered*,
including their *avoidance and the action required if they
occur* . . .." (856 IAC 1-33-2(a)).

172.     "The following <u>**cannot**</u> satisfy an offer:

   (1) *Making an offer for the patient to ask questions.*

   (2) *Any other method that serves to shift the
       responsibility from the pharmacists to the
       patient* for initiating the counseling or for
       selecting the informational content of the

57

counseling.

(3) ***Relaying information through an intermediary,*** unless needed for translations, hearing impaired, or other situation beyond the control of the pharmacist.

(4) ***Using signs or other types of written notices or written information given to the patient with each drug dispensed.***" (856 IAC 1-33-1.5(b)).

173. "[T]he pharmacy technician is **prohibited** from performing the following functions:

(1) ***Any duty required by law, regulation, or rule to be performed by a pharmacist.***

(2) The provision of advice or consultation with the prescriber or other licensed health care provider regarding the patient or the ***interpretation and application of information contained in the prescription or drug order, medical record,*** or ***patient profile.***

(3) The provision of advise or consultation with the patient regarding the ***interpretation of the prescription or the application of information contained in the patient profile or medical record.***

(4) Dispensing of prescription drug information to

the patient as required in IC 25-26-13-4.

    (5)   Receipt of a verbal prescription, other than a refill approval or denial, from a prescriber.

    (6)   ***Final check on all aspects of the completed prescription and assumption of the responsibility for the filled prescription,*** including, but not limited to, accuracy of the:

    (A)   drug;

    (B)   strength; and

    (C)   labeling." (856 IAC 1-35-5).

### LOUISIANA

### In Accordance with R.S. 37:1182, §§ 515 and 517

174.    "A ***pharmacist shall review the patient record*** and each prescription presented for dispensing for purposes of enhancing pharmacy care and therapeutic outcomes by recognizing the following potential situations:

1. **drug over-utilization or under-utilization;**

2. **therapeutic duplications;**

3. **drug-disease contraindications;**

4. **drug-drug interactions;**

5. **inappropriate drug dosage or treatment duration;**

6. **drug-allergy interactions;** or

7. **clinical abuse/misuse."**  (§ 515A).

175.     "Upon recognizing any of the above situations, the **pharmacist**, using professional judgment, **shall take appropriate actions**." (§ 515B).

176.     "Patient counseling means the effective communication by a pharmacist of information to the patient or caregiver, in order to ensure proper use of drugs and devices." ((§ 517A).

177.     "At a minimum, **the pharmacist should be convinced that the patient or caregiver is informed** of the following:

. . . 4.   Common severe side effects or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required in the event of their occurrence . . .." (§ 517B).

178.     "**The pharmacist** may supplement oral information with written information, but **shall not use written information alone to fulfill the counseling requirement**." (§ 517C).

179.     "Pharmacy technicians **shall not**:

> 1. **release a verbal prescription order** for processing **until it is reduced to written form and initialed by the** receiving technician and **supervising pharmacist;**
>
> 2. **interpret prescription orders** (however, a

**60**

technician   may   translate   the   prescription
orders);

3. compound high-risk sterile preparations . . .;

4. **counsel patients.**" (§ 907C).

### MARYLAND

### COMAR 10.34.03.16

180.     "The ***pharmacist shall*** be available as necessary
to   provide   pharmaceutical   care   to   individual   patients
including, but not limited to:

.   .   .   D.   ***Identifying potential and actual medication-
related problems, resolving actual medication-related
problems,*** and ***preventing medication-related problems*** caused
by:

        (1)   **Untreated indications;**

        (2)   **Improper drug selection;**

        (3)   **Sub-therapeutic dosage;**

        (4)   **Failure to receive medication;**

        (5)   **Over dosage;**

        (6)   **Adverse drug reactions;**

        (7)   **Drug interactions,** including ***drug-drug,
drug-food, drug-laboratory test
interactions;*** and

**61**

(8) **Medication use without appropriate indication."** (10.36.03.16D).

181.    "The pharmacist shall provide supervision to unlicensed personnel." (10.34.21.04(A)).

182.    "The **pharmacist may not delegate any pharmacy acts to unlicensed personnel."** (10.34.21.04(B)).

### MASSACHUSETTS

### 247 CMR 9.07

183.    "A **pharmacist shall conduct a prospective drug utilization review** ("DUR") **before each new prescription is dispensed or delivered to a patient or a person acting on behalf of the patient.** This DUR may include a review of the patient record and each new prescription presented for dispensing, for the purpose of promoting therapeutic appropriateness, by making a reasonable effort to identify the following:

    1. **over-utilization or under-utilization;**

    2. **therapeutic duplication;**

    3. **drug-disease contraindication;**

    4. **drug-drug interaction;**

    5. **incorrect drug dosage or duration of drug treatment;**

    6. **drug-allergy interactions;**

7. **clinical abuse or misuse; and**

8. **any significant change in drug, dose or directions.**" (247 CMR 9.07(2)(a)).

184.    "Upon identifying any of the above, the **pharmacist shall take appropriate measures to ensure the proper care of the patient** which may include consultation with the prescribing practitioner and/or direct consultation with the patient." (247 CMR 9.07(2)(b)).

185.    "The pharmacist . . . shall offer the services of the pharmacist to discuss, with all persons presenting new prescriptions, issues that in the pharmacist's professional judgment are deemed to be significant for the health and safety of the patient." (247 CMR 9.07(3)(a)).

186.    "A **sign** of not less than 11 inches in height by 14 inches in width **shall be posted in a conspicuous place**, adjacent to the area where prescriptions are dispensed, informing customers of their rights, pursuant to 247 CMR 9.00 and to M.G.L. c. 94C, § 21A, to counseling by a pharmacist where their prescription was filled. Said sign shall read, in letters not less than 1⁄2" in height: **"Dear patients, you have the right to know about the proper use of your medication and its effects. If you need more information please ask the pharmacist."** (247 CMR 9.07(3)(c)).

187.    When the offer to counsel is accepted, the **pharmacist shall provide such information** which, in the pharmacist's professional judgment, is **necessary for the patient to understand the proper use of the patient's prescription** which may include the following:

188.    . . . 4. common severe side and adverse effects or interactions and therapeutic contraindications or precautions with legend and non-legend medications which the pharmacist deems relevant; techniques for self-monitoring drug therapy; . . .."  (247 CMR 9.07(3)(d)).

189.    "**Counseling must be made by a <u>pharmacist</u>**, or a pharmacy intern under the direct supervision of the pharmacist if deemed appropriate by the pharmacist." (247 CMR 9.07(3)(h)).

### MICHIGAN

### Mich. Admin. Code r. 338.490

190.    "A **pharmacist shall not fill a prescription order if**, in the pharmacist's professional judgment, any of the following apply:

    (a)  The prescription appears to be **improperly written**.

    (b)  The prescription is **susceptible to more than 1 interpretation**.

    (c)  **The pharmacist has reason to believe that the**

**64**

**prescription could cause harm to the patient**.

(d) **The pharmacist has reason to believe that the prescription will be used for other than legitimate medical purposes**." (380.490.20(2)).

191.    "To encourage intended, positive patient outcomes, a **pharmacist shall communicate, to the patient or the patient's caregiver, necessary and appropriate information regarding safe and effective medications use at the time a prescription is dispensed**." (338.490.20(4)).

**MINNESOTA**

**Minn. Admin. R. 6800.3110**

192.    "**A reasonable effort must be made by the pharmacy to obtain, record, and maintain at least the following information regarding individuals obtaining prescription services at the pharmacy:**

. . .    B.    individual history where significant, including **disease state or states, known allergies and drug reactions**, and a **comprehensive list of medications** and relevant devices being used showing the prescription number, the name and strength of the drug or device, the quantity and date received by the patient, and the name of the prescriber; **if this information is obtained by someone other than the pharmacist, the pharmacist must review the**

65

*information with the patient*; and

     C.   pharmacist   comments  relevant   to   the individual's drug therapy, including, where appropriate, documentation of the following for each prescription:

         (1) the pharmaceutical care needs of the patient;

         (2) the services rendered by the pharmacist; and

         (3) the pharmacist's impression of the patient's drug therapy." (6800.3110 Subpart 2).

193.    "Upon receiving a prescription drug order, *a pharmacist shall examine the patient's profile record before dispensing the medication to determine the possibility of a harmful drug interaction or reaction*. Upon recognizing a potentially harmful interaction or reaction, the pharmacist shall take *appropriate steps to avoid or resolve the problem* which shall, if necessary, include consultation with the prescriber." (6800.3110 Subpart 3).

194.    "Upon receiving a prescription drug order, or prescription refill request for a patient, a *pharmacist shall examine the patient's profile record and conduct a prospective drug review* to identify:

    A. **overutilization or underutilization;**

    B. **therapeutic duplication;**

C. **drug-disease contraindications;**

D. **drug-drug interactions;**

E. **incorrect drug dosage or duration of drug treatment;**

F. **drug-allergy interactions;** or

G. **clinical abuse or misuse.**

Upon recognizing any of these drug-related problems, *the pharmacist shall take appropriate steps to avoid or resolve the problem which shall, if necessary, include consultation with the prescriber.*

For the purpose of meeting the requirements of this subpart, a pharmacist may rely on computerized medication profile review, provided that it includes all medication dispensed by the pharmacy for the patient during at least the preceding six months.  The **pharmacist-in-charge must develop procedures for handling alerts** generated by the computerized medication profile review and include these procedures in the written procedures required under part 6800.3950.  *Only a pharmacist or a pharmacist-intern working under the immediate and direct supervision of a pharmacist may override the alert.*" (6800.3110 Subpart 4).

### NEW HAMPSHIRE

### Chapter Ph 706

195.    "A *pharmacist shall review the patient record* and

67

each prescription presented for dispensing for the purposes of identifying:

      (1)  **Over-utilization or under-utilization;**

      (2)  **Therapeutic duplication;**

      (3)  **Drug-disease contraindication;**

      (4)  **Drug-drug interactions;**

      (5)  **Incorrect drug dosage or duration of drug treatment;**

      **(6)**  **Drug-allergy interactions; and**

      (7)  **Clinical abuse or misuse.**" (Ph 706.02(a)).

196.    "Upon recognizing any of the above, the ***pharmacist shall take appropriate steps to avoid or resolve the problem which might include consultation with the prescriber.***" (Ph 706.02(b)).

197.    "Upon receipt or delivery of a new prescription and following a review of the patient's record, a pharmacist or his/her designee, ***shall orally offer to discuss matters which will enhance or optimize drug therapy*** with each patient or caregiver of such patient." (Ph 707.03(a)).

198.    "**Patient counseling shall:**

    (1)  **Be by the pharmacist and in person, whenever practicable,** or by telephone; and

    (2)  Include appropriate elements of patient

counseling, such as the following:

. . . e. **Common side or adverse effects or interactions and
therapeutic contraindications** that might be encountered,
including their **avoidance**, and the **action required if they
occur**; . . .." (Ph 706.03(b)).

199.    "Pharmacy technicians **shall not**:

(1)  Accept an original telephone order for a
prescription;

(2)  Accept a refill authorization communicated
by telephone directly from a practitioner's
office;

(3)  **Evaluate patient profiles relative to
prospective drug review according to Ph
706.02**;

(4)  Communicate, orally or in writing, any
medical, therapeutic, clinical, or drug
information, or any information recorded on
a patient profile that requires professional
judgment or otherwise perform patient
counseling as required in Ph 706." (Ph
807.01(d)).

200.    "The pharmacist shall very and confirm the
correctness, exactness, accuracy and completeness of the

acts, tasks, and functions undertaken by the pharmacy technician who assists the pharmacist in the practice of pharmacy." (Ph 807.01(e)).

### NEW JERSEY

### 45:14 et seq.

201.    "'Drug utilization review' includes, but is not limited to, the following activities:

    (1)    **Evaluation of prescription drug orders and patient records** for **known allergies, rational therapy-contraindications, appropriate dose and route of administration** and **appropriate directions for use;**

    (2)    Evaluation of prescription drug orders and patient records for **duplication of therapy;**

    (3)    Evaluation of prescription drug orders and patient records for **interactions between drug-drug, drug-food, drug-disease** and **adverse drug reactions; and**

    (4)    Evaluation of prescription drug orders and patient records for **proper utilization,** including **over- or under-utilization, and optimum therapeutic outcomes."** (45:14-41(2)).

202.    "**A pharmacist shall conduct a drug utilization review before each new medication is dispensed or delivered to a patient.**" (45:14-66-27.a).

203.    "A pharmacist shall conduct a prospective drug utilization review in accordance with the provisions of this section before refilling a prescription or medication order to the extent he deems appropriate in his professional judgment." (45:14-66-27.b).

204.    **"A pharmacist shall exercise independent professional judgment as to whether or not to dispense or refill a prescription or medication order."** (45:14-66-27.c).

205.    "A pharmacist or his designee *shall offer to provide counseling to any person who presents a new prescription* in a manner as determined pursuant to criteria established by the board." (45:14-66-28).

206.    **"Pharmacy technicians shall not**: . . .

> (2) *Interpret a prescription or medication order for therapeutic acceptability and appropriateness*; . . .

> (5) *Provide patient counseling*;

> (6) Monitor prescription usage;

> (7) **Override computer alerts without first notifying the pharmacist**;

> (8) Transfer prescriptions from one pharmacy to another pharmacy . . .." (45:14-80(c)).

**NEW MEXICO**

**16.19.4 NMAC**

207.    "A  reasonable  effort  must  be  made  to  obtain,
record and maintain at least the following information . .
. individual  medical  history,  if  significant,  including
*disease state or states, known allergies* and *drug reactions*
and  a  *comprehensive  list  of  medications*  and  relevant
devices;  and  *pharmacists  comments*  relevant  to  the
individuals drug therapy." (16.19.4.16(C)).

208.    "A *pharmacist or pharmacist intern* *shall review*
*the patient record for*:

    (a)  **clinical abuse/misuse;**

    (b)  **therapeutic duplication;**

    (c)  **drug-disease contraindications;**

    (d)  **drug-drug interactions;**

    (e)  **incorrect drug dosage;**

    (f)  **incorrect duration of drug treatment;**

    (g)  **drug-allergy interactions;**

    (h)  **appropriate medication indication."**

       (16.19.4.16(D)(1)).

    (i)  "Upon recognizing any of the above, the

       *pharmacist shall take appropriate steps to avoid*

       *or resolve the problem* which shall, if necessary,

       include consultation with the prescriber."

(16.19.4.16(D)(2)).

209.    "Upon receipt of a new prescription drug order and following a review of the patient's record, a **pharmacist or pharmacist intern** *shall personally offer to counsel on matters which will enhance or optimize drug therapy* with each patient or the patient's agent." (16.19.4.16(E)(1)).

210.    *"A pharmacist shall in no way attempt to circumvent or willfully discourage a patient or patient's agent from receiving counseling."* (16.19.4.16(E)(5)).

211.    "In every pharmacy there shall be a prominently posted in a place conspicuous to and readable by prescription drug consumers a **notice** concerning available counseling." (16.19.4.16(E)(7)).

### NEW YORK

### Part 63

212.    "**Pharmacists or pharmacy interns** *shall conduct a prospective drug review before each prescription* is dispensed or delivered to a patient or person authorized to act on behalf of the patient. Such review shall include screening for potential drug therapy problems due to *therapeutic duplication*, *drug-drug interactions*, including *serious interactions with over-the-counter drugs*, *incorrect*

*drug dosage or duration of drug treatment, drug-allergy interactions*, and *clinical abuse or misuse.* Patient medication profiles shall be maintained in a retrievable form for five years following the date of the most recent entry." (§63.6(b)(7)).

213.   "[A] pharmacist or pharmacy intern providing prescription services *shall be required to personally counsel each patient* or person authorized to act on behalf of a patient who presents a prescription, consistent with the provisions of section 29.1(b)(8) of this Title, in person in a *face-to-face meeting whenever practicable . . .*" (§63.6(b)(8)(a)).

214.   "The counseling of a patient or person authorized to act on behalf of a patient pursuant to clause (a) of this subparagraph **shall be provided personally by the pharmacist** or the pharmacy intern and **shall not be delegated to an individual not authorized to practice pharmacy** under a license or limited permit." (§63.6(b)(8)(b)).

### NORTH CAROLINA

### 21 NCAC 46.2504

215.   "*An offer to counsel shall be made* on new or transfer prescriptions at the time the prescription is

**74**

dispensed or delivered to the patient or representative. Ancillary personnel may make the offer to counsel, but the *pharmacist must personally conduct counseling if the offer is accepted*." (21 NCAC 46.2504(b)).

216. "In order to counsel patients effectively, *a reasonable effort shall be made to obtain, record, and maintain significant patient information* . . .." (21 NCAC 46.2504(c)).

217. "Once patient information is obtained, *this information shall be reviewed and updated by the pharmacist* . . . before each prescription is filled or delivered, typically at the point-of-sale . . . to screen for potential drug therapy problems due to:

    (1)  **therapeutic duplica**tion;

    (2)  **drug-disease contraindication;**

    (3)  **drug-drug interactions, including serious interactions with prescription or over-the-counter drugs;**

    (4)  **incorrect drug dosage or duration of drug treatment;**

    (5)  **drug-allergy interactions; and**

    (6)  **clinical abuse/misuse**." (21 NCAC 46.2504(c)).

**OKLAHOMA**

**535:10-9**

218.   **"Prospective drug review shall be performed by the pharmacist in all pharmacies when deemed appropriate in the pharmacist's professional judgment or when required by applicable federal or state laws or rules.**   A pharmacist shall review the patient record and each prescription drug order presented for dispensing for purposes of promoting therapeutic appropriateness by identifying the following:

(A)   **overutilization or underutilization;**

(B)   **therapeutic duplication;**

(C)   **drug-disease contraindications,** if disease is known;

(D)   **drug-drug contraindications;**

(E)   **incorrect drug dosage or duration of drug treatment;**

(F)   **drug-allergy interactions;**

(G)   **clinical abuse/misuse.**

Upon recognizing any of (1)(A)-(G) of this section, the **pharmacist shall take appropriate steps to avoid or resolve the problem** which shall, if necessary, include consultation with or notification of the prescriber."   (535:10-9-1).

219.   **"Counseling shall be performed by the pharmacist**

**76**

*when deemed appropriate in the pharmacist's professional judgment or when required by applicable federal or state laws or rules."* "[A] *pharmacist shall assure that an offer is made to each patient or caregiver* . . .." (535:10-9-2).

220.    "These duties shall be performed by a **pharmacist** and **shall not be performed by supportive personnel**:

    (1)  Final interpretation of the prescriber's original order.

    (2)  **Performance of the prospective drug utilization review and determination of action to be taken when there is an indication of a drug interaction.**

    (3)  Receipt of new phone-in prescriptions from prescribers or their agents.

    (4)  Determination of product selection if substitution is requested or approved.

    (5)  **Certification of the completed prescription or medication order for accuracy and completeness before dispensing from the pharmacy department.**

    (6)  **Provision of patient counseling** or drug information as necessary." (535:15-5-7.7).

**RHODE ISLAND**

**R5-19.1-PHAR**

77

221.     "A **pharmacist shall review the patient record** and each prescription presented for dispensing for purposes of promoting therapeutic appropriateness by identifying:

    a) **over-utilization or under-utilization;**

    b) **therapeutic duplication;**

    c) **drug-disease contraindications;**

    d) **drug-drug interactions;**

    e) **incorrect drug dosage or duration of drug treatment;**

    f) **drug-allergy interactions;**

    g) **clinical abuse/misuse;**

    h) **food-drug interaction.**

Upon recognizing any of the above, **the pharmacist shall take appropriate steps to avoid or resolve the problem** which shall, if necessary, include consultation with the practitioner or other appropriate persons." (13.15).

222.     "After receipt of a new prescription and following a review of the patient's record, a **pharmacist** or pharmacy intern, as defined in Chapter 5-19.1, **shall initiate discussion of matters which will enhance or optimize drug therapy** with each patient or care giver of such patient. Such discussion shall be in person whenever

practicable . . .." (13.16).

223.   "A *pharmacy technician* **may not perform drug utilization review;** clinical conflict resolution, prescriber contact concerning prescription drug order clarification or therapy modification; **patient counseling** or dispensing process validation; or receive new prescription drug orders or conduct prescription transfers." (23.15.2).


### TENNESSEE

### CHAPTER 1140-3

224.   *A pharmacist shall be responsible for a reasonable review of a patient's record prior to dispensing each medical or prescription order.* The review shall include evaluating the medical and prescription order for:

> 1. **over-utilization or under-utilization;**
>
> 2. **therapeutic duplication;**
>
> 3. **drug-disease contraindication;**
>
> 4. **drug-drug interactions;**
>
> 5. **incorrect drug dosage or duration of drug treatment;**
>
> 6. **drug-allergy interactions;**
>
> 7. **clinical abuse/misuse.**

Upon recognizing any of the above, the **pharmacist shall take appropriate steps to avoid or resolve the problem.**" (1140-3-.01(3)).

225.    "Upon the receipt of a medical or prescription order and following a review of the patient's record, a **pharmacist shall personally counsel the patient or caregiver "face-to-face"** if the patient or caregiver is present. If the patient or caregiver is not present, a pharmacist shall make a reasonable effort to counsel through alternative means. **Alternate forms of patient information may be used to supplement, but not replace, face-to-face patient counseling.**" (1140-3-.-1(1)(a) and (b)).

## VIRGINIA

## § 54.1-3319

226.    "A pharmacist shall conduct a prospective drug review before each new prescription is dispensed or delivered to a patient or a person acting on behalf of the patient. Such review shall include *screening for potential drug therapy problems* due to **therapeutic duplication, drug-disease contraindications, drug-drug interactions, including serious interactions with nonprescription or**

80

**over-the-counter drugs**, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse. A pharmacist may conduct a prospective drug review before refilling a prescription to the extent the pharmacist deems appropriate in his professional judgment." (§ 54.1-3319(A)).

227.    A **pharmacist shall offer to counsel any person who presents a new prescription for filling.** The offer to counsel may be made in any manner the pharmacist deems appropriate in his professional judgment, and may include any one or a combination of the following:

1. Face-to-face communication with the pharmacist or the pharmacist's designee;

2. A sign posted in such a manner that it can be seen by patients;

3. A notation affixed to or written on the bag in which the prescription is to be delivered;

4. A notation contained on the prescription container; or

5. By telephone." (§ 54.1-3319(B)).

228.    "**Such counseling shall be performed by the pharmacist himself.**

For the purposes of medical assistance and other third-

party reimbursement or payment programs, *any of the above methods*, or a combination thereof, *shall constitute an acceptable offer to provide counseling, **except to the extent this subsection is inconsistent with** regulations promulgated by the federal Health Care Financing Administration governing* **42 U.S.C. § 1396r-8 (g) (2) (A) (ii)**. A pharmacist may offer to counsel any person who receives a refill of a prescription to the extent deemed appropriate by the pharmacist in his professional judgment." (§ 54.1-3319(C)).

### WISCONSIN

### Wisconsin Admin. Code Chapter 7 Phar.

229.     "The ***pharmacist shall*** be responsible for attempting to ***ascertain and record any patient allergies, adverse drug reactions, drug idiosyncrasies***, and any ***chronic conditions which may affect drug therapy*** as communicated by the patient or agent of the patient.   If none, this should be indicated." (Phar 7.07(3)).

230.     "At the time a prescription order is reviewed by the pharmacist for dispensing, ***the pharmacist shall review the medication profile record of the patient*** for the previously dispensed medication history and shall determine whether the prescription order presented should be

dispensed." (Phar 7.07(4)).

231.     "A **pharmacy technician** <u>**may not**</u> **do any of the following:**

   (a)   Provide the **final verification** for the accuracy, validity, completeness, or appropriateness of a filled prescription or medication order.

   (b)   <u>**Perform any of the following tasks**</u>:

    1. **Participate in final drug utilization reviews.**

    2. **Make independent therapeutic alternate drug selections.**

    3. Participate in final drug regimen screening, including **screening for therapeutic duplication, drug-to-drug interactions, incorrect dosage, incorrect duration of treatment, drug allergy reactions and clinical abuse or misuse.**" (Phar 7.015(3)).

232.     "The **pharmacist** or pharmacist-intern as directed and supervised by a pharmacist **shall**: . . . **Give the patient or agent appropriate consultation** relative to the prescription except that prescriptions may be delivered by an agent of the pharmacist to a patient's residence if the delivery is accompanied by appropriate directions and an indication that consultation is available by contacting the pharmacist.    The consultation requirement applies to

original and renewal prescription orders and, except when prescriptions are delivered to a patient's residence, is *not satisfied by only offering to provide consultation.*" (Phar 7.01(1)(e)).

### DEFENDANTS CERTIFIED COMPLIANCE PRIOR TO BILLING MEDICARE FOR PHARMACY SERVICES IN ITS MEDICARE ENROLLMENT APPLICATION (CMS-855S)

233.    In order to bill Medicare, Defendants, through "An **AUTHORIZED OFFICIAL** . . . (for example, *chief executive officer, chief financial officer, general partner, chairman of the board,* or *direct owner*) . . . [with] the legal authority to enroll it in the Medicare program . . . [or] A **DELEGATED OFFICIAL** . . . delegated by an authorized official" was **required to sign the application and agree** "*to immediately notify the NSC if any information in [the] application is not true, correct, or complete.*" (Exhibit 2, Page 31).

234.    "By signing [the Medicare Enrollment Application] the supplier is attesting to have read the requirements and understand them." (Exhibit 2, Page 32).

235.    "*I agree to abide by the Medicare laws, regulations, and program instructions* are available through the Medicare contractor. *I understand that payment of a claim by Medicare is conditioned upon the claim and the*

84

*underlying   transaction   complying   with   such   laws*,
*regulations*, *and* *program instructions* (including, but *not*
*limited to*, the Federal anti-kickback statute and the Stark
law, *and* on the supplier's *compliance with all conditions*
*of participation in Medicare*." (Exhibit 2, page 32).

236.    "*I will not knowingly present or cause to be*
*presented a false or fraudulent claim for payment by*
*Medicare*, *and will not submit claims with deliberate*
*ignorance or reckless disregard of their truth or falsity*."
(Exhibit 2, Page 32).

237.    "I have read the contents of this application and
the   certification   statement   in   section   15   of   this
application.   My   signature   legally   and   financially   binds
this   supplier   to   the   laws,   regulations,   and   program
instructions   of   the   Medicare   program." (Exhibit 2, Page
33).

### WALGREENS COMPLIANCE AND BUSINESS CODE OF ETHICS

238.    According    to    Walgreens    Health    Initiatives
Pharmacy   Manual   revised   January   2011,   "Pharmacies   will
comply   with   the   terms   of   its   Pharmacy   Network   Agreement
with Walgreens Health Initiatives, the Social Security Act,
Medicare Part D implementing regulations, 42 CFR Parts 400-
423,   CMS   instructions   and   the   federal   anti-kickback

85

statute, 42 USC §1320a-7b(b), as any of which may be amended from time to time. In addition, **the pharmacy will comply with any state specific Medicaid requirements**, including any requirements applicable to pharmacy set forth in the contract between the plan sponsor and the applicable Medicaid agency, as a condition of participating in Walgreens Health Initiatives' Medicaid network for such state(s)." (Exhibit 3, Page 6).

239.    According to Walgreens Code of Business Conduct, "We follow healthcare laws . . . [t]his includes laws and regulations such as the Federal Anti-Kick-back Statute, Stark Law, **Federal Civil False Claims Act (FCA)** and Federal False Statements Act.    In general, **these laws seek to: Prevent any false or fraudulent claims to federal healthcare programs, such as Medicare and Medicaid, Ensure that decisions made by healthcare providers about patient treatment or product use are not influenced by personal gain, Reduce the cost of healthcare to support patients and promote the quality of healthcare services.**" (Exhibit 4, Page 19).

## WALGREENS REQUIRED BY OFFICE OF INSPECTOR GENERAL OF THE DEPARTMENT OF HEALTH AND HUMAN SEVICES TO ENTER A CORPORATE INTEGRITY AGREEMENT IN 2008

240.    As part of a settlement agreement, Walgreens

entered into a Corporate Integrity Agreement signed by Gregory E. Demske on behalf of HHS on 2 June 2008 for a period of FIVE years, i.e. June 2013. (Exhibit 5).

241.    "Walgreen Co. hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to **enhance Walgreen Co.'s compliance with the _statutes_, _regulations_, and written directives of Medicare, Medicaid, and _all other Federal health care programs_** (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements). The terms of this CIA shall be **applicable to any division, subsidiary, or affiliate of Walgreen Co. that conducts retail or mail order pharmacy operations** (collectively, "Walgreens")." (Exhibit 5, Pages 1, 33 and 34).

242.    The CIA requires that an Independent Review Organization (IRO) be formed.

243.    "The **IRO shall:** assign individuals to conduct the Government Reimbursement Review who have expertise in (a) the billing, reporting, and other requirements of pharmaceutical reimbursement; (b) the general requirements of the Federal health care program(s) from which Walgreens seeks reimbursement; and (c) the **laws** applicable to therapeutic interchanges, including but **_not limited to_**

**87**

***applicable Medicare and Medicaid rules and regulations and
state and local pharmacy laws*** . . .." (Exhibit 5, Appendix
A, Page 1).

244.     "The IRO shall: . . . 2. follow all applicable
Medicare and Medicaid rules and guidelines in the
Government Reimbursement Review; 3. if in doubt of the
application of a particular Medicare or Medicaid policy or
regulation, request clarification from the appropriate
authority . . .." (Exhibit 5, Appendix A, Page 2).

**DISPENSING OF PRESCRIPTION MEDICATIONS BY CHAIN PHARMACISTS**

245.     Sixty-one percent of pharmacists working in chain
settings dispensed ***over 200 prescriptions daily***, according
to the 2004 National Pharmacy Workforce Survey. (Exhibit 6,
Page 8).

246.     Full-time pharmacists in chain settings worked an
average of 41.8 hours/week in 2009 and 42.8 hours/week in
2004. (Exhibit 7, Page 27).

247.     Full-time pharmacists in 2009 devoted 55% of
their time to medication dispensing and 16% of their time
to patient care services. (Exhibit 7, Page ix).

248.     Based on the statistics from the National
Pharmacy Workforce Studies from 2004 and 2009, pharmacists
in chains dispense more than 24 prescriptions per hour.

With only 55% of their time dedicated to dispensing prescriptions and 16% of their time for patient care services, **_full-time chain pharmacists spend less than 83 seconds_** of dedicated time **_per prescription_** dispensed and **_less than 16 seconds regarding patient care services_** per prescription dispensed.

249.    According to an April 2012 study, counseling by community pharmacists for **3 to 5 minutes** with follow-up conversations of 1 to 2 minutes significantly improves adherence to appropriate medication therapy.  "In 2009, the annual cost of nonadherence in the USA was estimated at USD**$290 billion**." (Exhibit 8, Pages 323 and 324).

### ADVERSE DRUG EVENTS AND PRESCRIPTION OVERDOSE DEATHS

250.    "A study from 1996 estimated that **_drug-related morbidity and mortality costs_** as much as **$136.8 billion annually** in the United States for subsequent medical care, excluding indirect costs such as lost productivity, **_and the costs have escalated over the past 16 years_**. The drug-related morbidity and mortality costs from the ambulatory population, where pharmacists arguably have the greatest impact in prevention, were estimated to be $76.6 billion annually in this same study." (Exhibit 9, Pages 298 and 299).

89

251.    "The elderly, in particular, often have more than one provider, due in large part to the physiological changes associated with aging. ***The elderly consume 74% of prescriptions and 51% of over-the-counter medications***, making them true beneficiaries of pharmacist counseling for the prevention of adverse drug events", after the pharmacist performs the mandated duties required under OBRA 90, state laws and regulations. (Exhibit 9, Page 295).

252.    A Veterans Administration study estimated that ***patient harm would have occurred absent pharmacist intervention in 90% of the cases*** (540/600 cases)." (Exhibit 9, Page 299).

253.    Only "*[t]hirty-five percent of adverse drug events may be prevented through the use of computerized medication ordering software* that checks for allergy to the drug, interactions with other drugs, and dosaging." (Exhibit 9, Page 299).

254.    "*[C]omputer systems* intended to help avert dangerous drug combinations ***fail to detect up to a third of drug-drug interactions***, while ***frequently alerting pharmacists to trivial or nonspecific interactions***." (Exhibit 10, Page 1652).

255.    "There is growing evidence that while automation can reduce some types of error, other types of ***errors can***

**90**

**actually be induced by systems.** The effect of repeated low-level or false alarms contributes to **"alarm or alert fatigue"; _crucial information is lost in the "noise" of the other alerts._"** (Exhibit 11, Page 53).

256.    "It is estimated that more than **700,000** individuals **are seen in hospital emergency departments for adverse drug events each year in the United States.** Nearly **120,000** of these patients **need to be hospitalized** for further treatment.  This is an important patient safety problem, but **many of these adverse drug events are preventable.**"

(Available at:

http://www.cdc.gov/MedicationSafety/program_focus_activities.html).

257.     "_As people age, they typically take more medicines. **Older adults** (65 years or older) **are twice as likely as others to come to emergency departments for adverse drug events** (over 177,000 emergency visits each year) and nearly **seven times more likely to be hospitalized after an emergency visit._"   "[I]n 2004, **over 7,500 Americans died of _unintentional_ overdoses of opioid analgesics** (pain medicines such as **methadone, oxycodone,** and **hydrocodone,** more people than from cocaine or heroin."

91

(Available at:

http://www.cdc.gov/MedicationSafety/Adult AdverseDrugEvents

.html).

258.    "Approximately *27,500* people *died* *from*
*unintentional drug overdoses in 2007*, driven to a large
extent by prescription opioid overdoses. *This is 4.6 times*
*as many deaths as all U.S. fatalities in both Operation*
*Iraqi Freedom and Operation Enduring Freedom in*
*Afghanistan*."

(Available at:

http://www.med.unc.edu/www/newsarchive/2011/april/narcotic-

pain-relief-drug-overdose-deaths-a-national-epidemic).

259.    "In **2008**, more than **36,000** people **died** from drug
overdoses, and most of these deaths were caused by
**prescription drugs**." (Available at:

http://www.cdc.gov/homeandrecreationalsafety/rxbrief/).

260.    "**The unprecedented rise in overdose deaths in the**
**US parallels a 300% increase since 1999 in the sale of**
**these strong painkillers**."   "These drugs were involved in
**14,800** overdose deaths in 2008, more than cocaine and
heroin combined."   "People on **Medicaid** are *prescribed*
*painkillers* at *twice the rate* of non-Medicaid patients and
are *six times the risk of prescription painkillers*
*overdose*.  One Washington State study found that *45% of the*

**92**

***people who died from prescription painkiller overdoses were Medicaid enrollees.***" "Enough prescription painkillers were prescribed in 2010 to medicate every American adult around-the-clock for one month." (Available at:

http://www.cdc.gov/homeandrecreationalsafety/rxbrief/).

261.    The White House released a report on 25 April 2012 revealing that "**Among new abusers** of pain relievers, 68 percent of new users (those who began misuse of pain relievers in the past year) obtained their abused pills from a friend or relative for free or took them without asking, ***17 percent were prescribed*** by one or more doctors, and 9 percent were purchased from a friend, dealer, or the Internet.  **Among occasional abusers** of pain relievers (less than once a week on average in the past year), 66 percent obtained the pills for free from a friend or relative or took them without asking, ***17 percent were prescribed*** from one or more doctors, and 13 percent were purchased from a friend or relative, dealer, or the Internet.  **Among chronic abusers** of pain relievers only 41 percent obtained the pills for free or without asking from a friend or relative, ***26 percent were prescribed*** from one or more doctors, and 28 percent were purchased from a friend, relative, dealer or the Internet." (Available at:

http://www.whitehouse.gov/ondcp/news-releases-remarks/national-survey-shows-friends-and-family-are-primary-sources-of-abused-painkillers).

262.    **"Prescription drug abuse is the Nation's fastest-growing drug problem**, and the Centers for Disease Control and Prevention has classified prescription drug abuse as an **epidemic."    "Some individuals who misuse prescription drugs, particularly teens, believe these substances are safer than illicit drugs because they are prescribed by a healthcare professional and dispensed by a pharmacist."** (Available at:

http://www.whitehouse.gov/ondcp/prescription-drug-abuse).

### DEFENDANTS' DRUG SUPPLY MILL

263.    "Leading pharmacy researchers have placed the safe average workload at 20 prescriptions filled an hour by pharmacists, documenting that anything beyond that drastically increases the risk for errors." (Exhibit 12).

264.    "According to Walgreens' own numbers from monthly store productivity reports, **58 Walgreens pharmacies in Northern Illinois have exceeded the 20- prescriptions-per-hour-per-pharmacist threshold** so far in 2005 - - nearly 1 in 5 pharmacies for which records are available.    Another 130 pharmacies are in the "grey zone" between 15 and 20

94

prescriptions per pharmacist hour, meaning they likely exceed the safety threshold at peak hours." (Exhibit 12).

265.    A symptom of Walgreens' systemic failure: **"This is the direct result of Walgreens' systematic implementation of its assembly line philosophy, under which pharmacists are made to work at ever- increasing speeds, compromising patient safety."** (Exhibit 12).

266.    Other states have also set workload standards to help prevent prescription errors.   North Carolina's Board of Pharmacy set a "150- prescription-per-shift threshold (or 18.75 [per hour per pharmacist] for an eight hour shift).   In 1994, the Iowa Board of Pharmacy Examiners set a quota of 14 prescriptions per hour per pharmacist." (Exhibit 12).

267.    "Walgreens is caught in its own Web of mistruths," said Chuck Sauer, executive director of the National Pharmacists Association."   The bottom line is that **many pharmacists are too rushed to make sure patients go home with the right prescription.   We're not willing to put up with that level of risk.   Walgreens seems to be."** (Exhibit 12).

### DEATHS DUE TO DEFENDANTS' HEALTH CARE QUALITY FRAUD AND *PER SE* STATUTORY AND REGULATORY VIOLATIONS

#### GBI Prescription Drug Deaths Reported 2010

268.    There were 435 deaths attributable to accidental multiple prescription deaths, excluding illicit drugs, in 2010 according to the Georgia Bureau of Investigations statistics.

## Georgia, Cobb County Deaths

269.    There were 31 deaths in Cobb County, Georgia in 2007 attributable to accidental multiple drug toxicity plus an additional 7 accidental deaths attributable to methadone/narcotic toxicity (total excluding illicit drugs and excess alcohol = 38). (Exhibit 13).

270.    There were 35 deaths in Cobb County, Georgia in 2008 attributable to accidental multiple drug toxicity plus an additional 8 accidental deaths attributable to methadone/narcotic toxicity (total excluding illicit drugs and excess alcohol = 43). (Exhibit 14).

271.    There were 48 deaths in Cobb County, Georgia in 2009 attributable to accidental multiple drug toxicity plus an additional 12 accidental deaths attributable to methadone/narcotic toxicity (total excluding illicit drugs and excess alcohol = 60). (Exhibit 15).

272.    There were 45 deaths in Cobb County, Georgia in 2010 attributable to accidental multiple drug toxicity plus an additional 5 accidental deaths attributable to

methadone/narcotic toxicity (total excluding illicit drugs
and excess alcohol = 50). (Exhibit 16).

273.     There were 56 deaths in Cobb County, Georgia in
2011 attributable to accidental multiple drug toxicity plus
an additional 7 accidental deaths attributable to
methadone/narcotic toxicity (total excluding illicit drugs
and excess alcohol = 63). (Exhibit 17).

274.     There was a **65.8% increase in deaths** in Cobb
County, Georgia alone between **2007 and 2011** attributable to
accidental drug toxicity, including multiple prescription
drugs, narcotics and single agent psychotropic medications.

### Florida

275.     Accidental prescription drug caused **deaths rose
7.9% in Florida from 2009 to 2010,** from 2,116 to 2,284.
(Exhibit 18, Page 35).

276.     Total prescription drug occurrences in medical
examiner cases rose 7.1% from 2009 to 2010, from 5,275 to
5,647. (Exhibit 18)

277.     In just two Florida counties, Pinellas and Pasco,
there were 349 accidental prescription drug caused deaths
in 2010 and 290 in 2011. (Exhibits 19 and 20).

### DEFENDANTS' HEALTH CARE QUALITY FRAUD

278.     The U.S. attorney's office "listed [these] four
critical questions that would determine the government's

prosecution effort . . .. **"What is the quality we are paying for?"**. (Exhibit 21).

### Liability for Healthcare Quality Fraud

1. "Has there been a systemic failure by management and the board to address quality issues?

2. Has the organization made false reports about quality or failed to make mandated reports?

3. Has the organization profited from ignoring poor quality or ignoring providers of poor quality?

4. Have patients been harmed by poor quality or given false information about quality?"

279. **"Why (and When) Fraud Enforcement"**

1. "Knowing Conduct by Institution/Gross and Systemic Leadership Failures (notice, warning, failure to act)

2. Intentional acts by individuals

3. False reporting, failure to report

4. Appalling outcomes

5. What will be consequences of our involvement?"

280. **Liability Analysis**:

1. *Has there been a systemic failure by management and the board to address quality issues?* **YES.**

   i. Management for defendants has failed to comply with prospective drug utilization

98

reviews resulting in a **_systemic failure_ to _address quality issues mandated by Congress and state legislators and agencies_.**

2. *Has the organization made false reports about quality or failed to make mandated reports?* **YES.**

   i. **Compliance with the laws and regulations (including prospective drug utilization review) is a _prerequisite to government payment_.**

   ii. Defendants have submitted **_expressly false claims_** to the government for payment.

   iii. The organization has failed to make mandated entries/reports for therapeutic optimization by each dispensing pharmacist as a *per se* violation of federally mandated state statutes and regulations for payment by CMS.

   iv. By submitting claims for payment to Medicare and Medicaid, Defendants have made false reports to CMS based on the explicit agreement and certification by the (CEO/CFO) that Defendants would comply with, but not limited to, **"Medicare laws, regulations and program instructions."** (Exhibit 2, Page 32).

99

    v.  Defendants **"understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law, and on the supplier's compliance with all conditions of participation in Medicare."** (Exhibit 2, Page 32).

    vi.  Defendants further certified, "*I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*" (Exhibit 2, Page 32).

3. *Has the organization profited from ignoring poor quality or ignoring providers of poor quality?* **YES.**

    i.  Defendants have saved tremendous amounts of money by not providing the statutory and regulatory mandates of prospective drug review and offer to counsel by pharmacists.

     ii.  Defendants have profited in the billions of dollars annually.  Revenue from drug sales in 2011 was approximately **$46.7 billion** of which approximately **$17 billion was derived from Medicare and Medicaid drug sales.**

4. *Have patients been harmed by poor quality or given false information about quality?* **YES.**

     i.  **Thousands of patients have lost their lives** due to the poor quality of healthcare/pharmacy services by Defendants.

     ii.  In addition to the extraordinary number of avoidable deaths from drug interactions and unintentional overdoses, the CDC states: "It is estimated that more than **700,000** individuals **are seen in hospital emergency departments for adverse drug events each year in the United States**.  Nearly **120,000** of these patients **need to be hospitalized** for further treatment.  This is an important patient safety problem, but **many of these adverse drug events are preventable**."  (Available at: *http://www.cdc.gov/MedicationSafety/program focus_activities.html).*

iii.  Defendants now fill 20% of the nation's retail prescriptions, yet fail to perform prospective drug utilization reviews and offers to counsel by their pharmacists. Accordingly, **defendants cause approximately 140,000** individuals to be seen in hospital emergency rooms **each year** and approximately **24,000** hospitalizations **costing U.S. taxpayers billions of dollars annually for preventable adverse drug events**.

281.  **Fraud Enforcement Analysis:**

1. *Knowing Conduct by Institution/Gross and Systemic Leadership Failures (notice, warning, failure to act)*

    i.  By certifying compliance with all laws and regulations and with explicit notice of state laws and regulations Defendants have grossly and systemically (through their leadership and at every level) committed **per se violations** of the state laws and regulations promulgated pursuant to OBRA 90.

2. *Intentional acts by individuals*

    i.  The CEO/CFO of Defendants certified understanding the necessity to comply with

the laws and regulations for participation in Medicare, yet acted intentionally by not requiring Defendants' pharmacists to fulfill the duties mandated by those laws and regulations.

ii. Defendants increase corporate profits by offering incentives to pharmacists to increase the number of prescriptions dispense despite the pharmacists' inadequate time and manpower resources to comply with the laws and regulations regarding prospective drug utilization reviews and offers to counsel patients.

iii. This pattern of intentional acts by individuals has led to massive increases in prescription drug sales – billions annually.

3. *False reporting, failure to report*

i. In addition to the certification to CMS of compliance with all laws and regulations for participation in Medicare, Defendants file false or fraudulent claims for each prescription filled knowing the bundled service (prospective drug utilization review and offer to counsel) with the dispensed

drug was not performed by the pharmacists as *per se* violations of laws and regulations.

4. *Appalling outcomes*

    i. Defendants, through their systemic fraud, have caused many thousands of deaths from preventable adverse drug reactions and unintentional overdoses.

    ii. Defendants, through their systemic fraud, have caused billions in additional costs annually for U.S. taxpayers for emergency and hospital care for preventable adverse drug reactions.

5. *What will be consequences of our involvement?*

    i. The U.S. government will:

        1. Recover Medicare, Medicaid, TRICARE, CHAMPVA and federal employee benefits funds that have been paid to Defendants for their **per se violations of laws and regulations** and **healthcare quality fraud;**

        2. Prevent further billing fraud and healthcare quality fraud;

        3. Save thousands of lives annually;

4. Decrease the annual expenditures by Medicare, Medicaid, TRICARE, CHAMPVA and federal employee benefits programs for preventable emergency care and hospital services;

5. Eliminate a source of prescription drugs for drug-seekers to pursue via pill mills;

6. Address what the Centers for Disease Control and Prevention has deemed an "**epidemic.**" The CDC states: "**[p]rescription drug abuse is the Nation's fastest-growing drug problem,**" and "*some individuals who misuse prescription drugs . . . **believe these substances are safer** than illicit drugs **because they are** prescribed by a healthcare professional and **dispensed by a pharmacist.**" (Available at: http://www.whitehouse.gov/ondcp/prescription-drug-abuse).

7. Without enforcement, Defendants will continue to profit billions of U.S. taxpayer dollars annually from their

healthcare quality fraud and *per se* violations of laws and regulations at the costs of thousands of lives annually and untold billions of dollars in avoidable costs for preventable adverse drug events.   Additionally, without enforcement of prospective drug utilization reviews by pharmacists, *inter alias* other mandatory requirements, pill mills and the like will continue to have retail pharmacy outlets to supply the Nation's fastest growing drug problem and all of the suffering and crime that follows.

### DEFENDANTS' "PUNCH OR SIGN" COUNSELING WAIVER FRAUD

282.   When consumers present to Defendants' facilities to have their prescription filled most never are offered counseling.

283.   Instead, most consumers unwittingly sign waivers of counseling by signing a sheet that is described to them as necessary just to pick up their prescript.

284.   Other consumers unwittingly sign waivers of counseling by signing their name in the digitized card

swipe screen where the waiver or refusal of counseling is not recognizable or not even present on the screen. Again, Defendants' employees tell these consumers that their signature is required in order to pick up the prescription.

## SPECIFIC EXAMPLE OF WALGREENS' FAILURE TO PERFORM A PROSPECTIVE DRUG UTILIZATION REVIEW AND WAIVER FRAUD

285.   William Glenwood Clowdis, Jr. filled a prescription at Walgreens Pharmacy #06032 in Atlanta, Georgia on 18 May 2012. (Exhibit 22).

286.   The prescription had been called in from an out-of-state provider who had recently seen his patient to another Walgreens pharmacy in Atlanta, Georgia. (Exhibits 22 and 23).

287.   William Glenwood Clowdis, Jr. had never had a prescription filled at any pharmacy in Georgia, nor had he filled prescriptions at Walgreens. (Exhibit 23).

288.   William Glenwood Clowdis, Jr. was never asked to present any medical history, list any other medications he was taking or even questioned as to any health information. (Exhibit 23).

289.   The prescription label incorrectly addresses William Glenwood Clowdis, Jr.'s name as "Glen Clowdiss." (Exhibit 22).

290.    The  prescription  label  states,  "Need  Allergy
Info",  but  William  Glenwood  Clowdis,  Jr.  was  never
questioned regarding his allergies. (Exhibits 22 and 23).

291.    An  offer  to  counsel  was  NEVER  made  by  anyone  at
the  pharmacy  and  William  Glenwood  Clowdis,  Jr.  never  even
saw  a  pharmacist  present.    Then  entire  transaction  took
place with a clerk at the register. (Exhibit 23).

292.    There  was  no  waiver  of  counseling  obtained  in  the
transaction. (Exhibit 23).

293.    When  William  Glenwood  Clowdis,  Jr.  offered  his
driver's  license  to  verify  his  identity  to  pick  up  his
prescription,  without  looking  at  the  clerk  said  she  did  not
need  it  and  asked  only  about  his  method  of  payment.
(Exhibit 23).

294.    When  William  Glenwood  Clowdis,  Jr.  told  the  clerk
of  his  insurance  coverage  he  was  told  it  was  not  accepted
at  that  pharmacy,  so  he  completed  his  transaction  via  a
debit  card,  "punch",  at  3:53  PM  on  05/18/2012.  (Exhibit
23).

295.    There  are  potential  severe  drug-drug  interactions
with  the  dispensed  medication;  however,  no  history  was  ever
obtained  in  this  transaction  and  no  database  was  available
to  the  Walgreens  pharmacist  to  determine  whether  other
medications were prescribed or being taken.

**108**

296.    Walgreen Pharmacy #06032's pharmacist failed to **"make a reasonable effort to obtain from the patient . . . record any known allergies, drug reactions, idiosyncrasies,** and **chronic conditions or disease states** of the patient and the **identity of any other drugs,** including **over-the counter drugs or devices currently being used by the patient which may relate to the prospective drug review."** and failed to personally offer counseling.

## MEDICARE PATIENT: NO HISTORY ON FILE YET AT LEAST 13 DIFFERENT DRUGS WERE DISPENSED WITH OVERUTILIZATION – NO QUESTIONS ASKED

297.    A now 60-year-old female Medicare patient had prescriptions filled at Walgreens #6208 without any health conditions or known allergies on file.

298.    The prescriptions Walgreens dispensed from December 2010 to January 2012 and for which Medicare paid via CignaMPD included: Relistor; Synthroid; Premarin; Morphine Sulfate; Methocarbamol; OxyContin 40 MG concurrent with OxyContin 30 MG; Cymbalta; Nystatin/Triamcinolone; Metronidazole; Fluconazole; Chantix; and PEG-3350 & Electrolytes.

299.    This same 60-year Medicare patient had **_480 tablets_** of **_Morphine Sulfate_** Immediate Release 20 MG

Tablets, prescribed by **two different physicians** dispensed on 6/15/2011 and 7/5/2011.

300.    More significantly, OxyContin 30 MG and OxyContin 40 MG were concurrently dispensed, presumably for chronic pain management, although **Walgreens' pharmacy records** state, **"Health Conditions:  None on File."**

301.    If the patient truly required OxyContin 70MG per dose, the Morphine Sulfate, being used for 'break-through' pain, would only need to be **used sparingly**.  **NOT at the rate of 480 tablets in merely 20 days**.

### MEDICARE PATIENT: MAJOR & MODERATE DRUG-DRUG INTERACTIONS AND OVERUTILIZATION

302.    A now 59-year-old female Medicare patient had prescriptions filled from **7 different physicians** at Walgreens Pharmacy #6209, Heart Pharmacy and 3 different CVS pharmacies from 10/23/2011 to 12/31/2011.

303.    The prescriptions filled include: 1) narcotics – Hydrocodone and Codeine; 2) Tramadol, which acts as an opioid agonist also; and 3) muscle relaxants – Carisoprodol, Methocarbamol, Cyclobenzaprine and Orphenadrine.

304.    The prescriptions filled by Walgreens #6209 include:

      1. **Carisoprodol** Tab. 3-day supply on 10/30/2011;

2. **Cyclobenzaprine** Tab. 5-day supply and

3. **Tramadol** Tab. 5-day supply on 10/27/2011;

4. **Tramadol** 3-day supply on 12/02/2011; and

5. **Cyclobenzaprine** 5-day supply on 11/22/2011.

305.    The   prescriptions   filled   by   Heart   Pharmacy include:

1. Hydrocodone  Tab.  10-500  mg.,  30-day  supply  on 10/13/2011;

2. Orphenadrine Tab. (muscle relaxant) 30-day supply on 10/13/2011;

3. Hydrocodone  Tab.  7.5/750  mg.,  3-day  supply  on 10/08/2011;

4. Cyclobenzaprine, 5-day supply on 10/03/2011;

5. Hydrocodone   5-500   mg.,   4-day   supply   on 10/03/2011;

6. Cyclobenzaprine 10-day supply on 12/01/2011;

7. Hydrocodone 4-day supply on 11/29/2011;

8. Hydrocodone 34-day supply on 11/10/2011;

9. Orphenadrine   100   mg.,   30-day   supply   on 11/10/2011;

10.    Hydrocodone 3-day supply on 11/09/2011;

11.    Hydrocodone 2-day supply on 10/31/2011;

12.    the  patient  received  an  additional  34-day supply of Hydrocodone and

13.    an additional 30-day supply of Orphenadrine on 12/15/2011.

306.    The prescriptions filled by CVS include:

1) 5-day supply of Tramadol on 10/23/2011 at CVS #7622;

2) 4-day supply of Hydrocodone on 11/02/2011 at CVS #7622;

3) 2-day supply of Hydrocodone and 20-day supply of Methocarbamol on 11/04/2011 at CVS #4549;

4) 30-day supply of Hydrocodone on 11/16/2011 at CVS #7622;

5) 2-day supply of Tramadol on 11/20/2011 at CVS #7622;

6) 5-day supply of Hydrocodone on 11/25/2011 at CVS #4757;

7) 3-day supply of Codeine Tab and 15-day supply of Cyclobenzaprine Tab on 11/30/2011 at CVS #7622;

8) 10-day supply of Carisoprodol on 12/03/2011 at CVS #7622; and

9) 3-day supply of Hydrocodone on 12/04/2011 at #7622.

307.    The **overutilization** by this Medicare patient that was ___**IGNORED** by **Walgreens**___ is astounding.

308.    Equally concerning, there are **major and moderate drug-drug interactions** amongst the drugs filled at

**112**

Walgreens for this Medicare patient as well as for other drugs being dispensed by other pharmacies.

309. **Major drug interactions are highly clinically significant and the combinations should be avoided because the risks of interactions outweigh the benefits.** (Exhibit 24).

310. Included in the **severe/major drug-drug interactions** for this Medicare patient's regimen as filled by Walgreens **(BOLD)** are: (Exhibit 24).

1. **Cyclobenzaprine – Tramadol**
   i. Increased Risk of Seizures
   ii. CNS and Respiratory Depression
2. Codeine – **Tramadol**
   iii. Central Nervous System ("CNS") and Respiratory Depression
   iv. Precipitation of Withdrawal Syndrome
3. Hydrocodone – **Tramadol**
   v. Increased Risk of Seizures
   vi. CNS and Respiratory Depression

311. Moderate drug interactions are moderately clinically significant and the combinations are usually avoided and when used, only under special circumstances. (Exhibit 21).

**113**

312.     Included in the **moderate drug-drug interactions**
with this Medicare patient's regimen of prescriptions
filled by Walgreens **(BOLD)** are: (Exhibit 24).

      **1. Carisoprodol** – **Tramadol**

         i. CNS and Respiratory Depression

      **2. Carisoprodol** – **Cyclobenzaprine**

         i. CNS and Respiratory Depression

      **3.** Orphenadrine – **Tramadol**

         i. CNS and Respiratory Depression

      **4. Cyclobenzaprine** – Orphenadrine

         i. Excessive parasympathetic effects that may
result in paralytic ileus, hyperthermia,
heat stroke, and the anticholinergic
intoxication syndrome.

        ii. Memory loss, disorientation, incoherence,
hallucinations, psychosis, delirium
hyperactivity, twitching or jerking
movements, stereotypy, and seizures.

      **5. Cyclobenzaprine** – Hydrocodone

         i. CNS and Respiratory Depression

      **6.** Methocarbamol – **Tramadol**

         i. CNS and Respiratory Depression

      **7. Carisoprodol** – Hydrocodone

         i. CNS and Respiratory Depression

**8.** Codeine - **Carisoprodol**

    i. CNS and Respiratory Depression

9. Orphenadrine - Hydrocodone

    i. CNS and Respiratory Depression

10.    Codeine - Orphenadrine

    i. CNS and Respiratory Depression

11.    Codeine - Cyclobenzaprine

    i. CNS and Respiratory Depression

12.    Codeine - Methocarbamol

    i. CNS and Respiratory Depression

13.    Codeine - Hydrocodone

    i. CNS and Respiratory Depression

14.    Methocarbamol - Hydrocodone

    i. CNS and Respiratory Depression

## OVERUTILIZATION BY MEDICARE PATIENTS IGNORED

313.    Four different physicians prescribed narcotics for a now 59 year-old Medicare patient within a two-month period from October to December 2011.

314.    From 10/12/2011 to 12/15/2011 (64 days) the Medicare patient received 453 narcotic tablets, including:

**1.** Oxycodone - 60 tabs (30-day supply) from Walgreens #6897 on 12/15/2011.

2. Hydrocodone – 90 tabs (30-day supply) from Walgreens #6897 on 12/07/2011.

3. Hydrocodone – 30 tabs (15-day supply) from Walgreens #6897 on 10/14/2011.

4. Opana ER (opioid narcotic) - 60 tabs (30-day supply) from CVS #02088 on 11/17/2011.

5. Oxycodone - 53 tabs (26-day supply) from CVS #02088 on 11/17/2011.

6. Hydrocodone – 100 tabs (25-day supply) from Wal-Mart Pharmacy #101047 on 10/20/2011.

7. Endocet (opioid narcotic) – 30 tabs (15-day supply) from Eagles Landing Professional Pharmacy, Inc. on 10/12/2011.

8. Opana ER – 30 tabs (15-day supply) Eagles Landing Professional Pharmacy, Inc. on 10/12/2011.

315.    Another Medicare patient, now 87 years of age received **450 narcotic tablets** (Hydrocodone and Morphine Sulfate) in a 60-day period where all but 60 tablets were filled at Walgreens #6208 between 10/07/2011 to 12/07/2011. There were four prescribing providers and no indication that this was a cancer patient or otherwise.

### WALGREENS #9271

316.    A 65 year-old patient was dispensed multiple narcotic and psychotropic medications in dangerous

**116**

combinations and overutilization from **_10_** **_different_** **_providers from a single Walgreens pharmacy_** **_(#9271)_** from February to May 2012.

|  |  |  |  |  |
|---|---|---|---|---|
| 1. | Diovan | 5/11/12 | 90-day | Doc1 |
| 2. | Metoprolol | 5/11/12 | 90-days | Doc2 |
| 3. | Amitriptyline HCl | 5/10/12 | 30-days | Doc8 |
| 4. | Doxepin HCl | 5/07/12 | 90-days | Doc2 |
| 5. | Sertraline HCl | 5/07/12 | 30-days | Doc3 |
| 6. | Morphine Sulfate | 5/04/12 | 5-days | Doc9 |
| 7. | Amlodipine Besylate | 5/01/12 | 90-days | Doc2 |
| 8. | Morphine Sulfate IR | 5/17/12 | 90-days | N/A |
| 9. | Morphine Sulfate IR | 5/04/12 | 30-days | N/A |
| 10. | Bethanechol Cl | 5/01/12 | 30-days | Doc4 |
| 11. | Humulin N | 4/30/12 | 75-days | Doc5 |
| 12. | Furosemide | 4/27/12 | 90-days | Doc2 |
| 13. | Atorvastatin Ca | 4/27/12 | 90-days | Doc2 |
| 14. | Amitriptyline HCl | 4/17/12 | 30-days | Doc9 |
| 15. | Fluticasone Prop | 3/29/12 | 30-days | Doc6 |
| 16. | Oxycodone/Acetom | 3/22/12 | 30-days | Doc7 |
| 17. | Amitriptyline HCl | 3/18/12 | 30-days | Doc10 |
| 18. | Oxycodone/Acetom | 2/29/12 | 30-days | Doc9 |
| 19. | Amitriptyline HCl | 2/17/12 | 30-days | Doc9 |

317.    There are **2** major/sever drug-drug interactions in
this patient's dispensed prescription medications.

     **a. Amitriptyline - Sertraline**

        i. Serotonin Syndrome, Death

     **b. Doxepin - Sertraline**

        i. Serotonin Syndrome, Death

318.    There are also **26** moderate drug-drug interactions
in this patient's dispensed prescription medications.

     a. Furosemide - Metoprolol

        i. Hyperglycemia,          Hypertriglyceridemia,
Arrhythmia  from  QT  interval  prolongation,
Torsade de Pointes

     b. Morphine - Amlodipine

        i. Hypotension, Syncope

     c. Oxycodone - Amlodipine

        i. Hypotension, Syncope

     d. Furosemide - Sertraline

        i. Confusion,  Hallucination,  Seizures,  Death,
Hyponatremia, Orthostasis, Hypotension

     e. Metoprolol - Sertraline

        i. Hypotension, Bradycardia, Heart Block

     f. Morphine Sulfate - Sertraline

        i. CNS and Respiratory Depression

     g. Oxycodone - Sertraline

i. Serotonin Syndrom

h. Metoprolol - Valsartan (Diovan)

i. Unknown mechanism, but increases unfavorable outcomes on morbidity and mortality in heart failure patients

i. Morphine - Valsartan

i. Hypotension, Orthostasis

j. Furosemide – Insulin Isophane

i. Decreased insulin efficacy

k. Metoprolol – Insulin Isophane

i. Metoprolol may inhibit the normal physiologic response to hypoglycemia, masking symptoms of hypoglycemia

l. Metoprolol – Amlodipine

i. Additive reductions in heart rate, cardiac conduction and cardiac contractility

m. Furosemide – Amitriptyline

i. Hypotension, Orthostasis

n. Metoprolol – Amitriptyline

i. Hypotension, Orthostasis

o. Furosemide – Doxepin

i. Hypotension, Orthostasis

p. Metoprolol - Doxepin

i. Hypotension, Orthostasis

q. Amitriptyline - Doxepin

    i. Anticholinergic     intoxication     syndrome, urinary     retention,     psychosis,     seizures, tardive dyskinesia

r. Furosemide – Morphine

    i. Hypotension, Orthostasis

s. Metoprolol – Morphine

    i. Hypotension, Orthostasis

t. Amitriptyline – Morphine

    i. CNS and Respiratory Depression

u. Doxepin – Morphine

    i. CNS and Respiratory Depression

v. Furosemide – Oxycodone

    i. Hypotension, Orthostasis

w. Metoprolol – Oxycodone

    i. Hypotension, Orthostasis

x. Amitriptyline – Oxycodone

    i. CNS and Respiratory Depression

y. Doxepin – Oxycodone

    i. CNS and Respiratory Depression

z. Sertraline – Insulin Isophane

    i. Hypoglycemia

**A WALGREEN'S PHARMACIST SAYS IT IS THE CLIENTS'
RESPONSIBILITY ENSURE THE PRESCRIPTIONS ARE CORRECT**

319.    In  a  Georgia  State  Board  of  Pharmacy  Consent
Order  dated  6  June  2006,  a  pharmacist  for  Walgreen's
Pharmacy #5605 stated it is **"*the responsibility of the
client to examine the medication to ensure that it was
correct*"** after the pharmacist dispensed and again refilled
twice  the  prescribed  dose  of  Synthroid  (thyroid  hormone
replacement  medication)  discovered  by  the  patient  after
experiencing adverse effects for approximately two months.
(Exhibit 25).

320.    This  is  but  one  example  of  Defendants'  systemic
failure  to  abide  by  federal  and  state  statutes  in  favor  of
profitability,  otherwise  known  as  ***caveat emptor***.


**CONCLUSION**

321.    Medicare,  Medicaid  and  other  government  programs
are  paying  for  medications  that  are  being  diverted,  cause
harmful  interactions  and  death,  the  exact  opposite  outcome
from Congress' intention when it passed OBRA '90.

322.    Corporate  and  otherwise  profit  driven  pharmacies
have  left  patients  to  the  same  fate  as  those  who  bought
"snake oil" therapies in the past – ***caveat emptor***.


**121**

323.    State  statutes  and  regulations  promulgated pursuant to OBRA '90 do NOT permit pharmacists, pharmacy chains  or  corporations  to  leave  patients  to  fend  for themselves for the sake of profits.

### VI. CAUSES OF ACTION

#### COUNT I
#### SUBSTANTIVE VIOLATIONS OF THE FALSE CLAIMS ACT

**[31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1) and 3732(b)]**

324.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

325.    Through the acts described above, Defendants, by and through their officers, agents and employees, knowingly presented  or  caused  to  be  presented  to  an  officer  or employee  of  the  United  States  Government  and  state governments participating in the Medicaid program, false and fraudulent claims, records, and statements in order to obtain reimbursement for healthcare services provided under Medicare,  Medicaid,  CHAMPUS/TRICARE,  CHAMPVA,  the  Federal Employee Benefits Program and other government agencies and programs.

326.    In addition, or alternatively, through the acts described above and otherwise, Defendants, by and through

their officers, agents and employees, knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States.

327.    The United States, its fiscal intermediaries, and the state Medicaid programs, unaware of the falsity of the records, statements, and claims made or submitted by defendants and their agents and employees paid and continue to pay defendants for claims that would not be paid if the truth were known.

328.    By reason of the defendants' false records, statements, claims, and omissions, the United States and the state Medicaid programs have been damaged in the amount of many billions of dollars in Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Benefits Program and other federal agencies and programs.

329.    Each of the actions described in the Paragraphs within Count I is a violation of the False Claims Act, 31 U.S.C. § 3729, for which the Defendants are liable for damages as mandated by the statute.

**COUNT II**
**FALSE CLAIMS ACT CONSPIRACY**

**[31 U.S.C. § 3729(a)(3) and 3732(b)]**

330.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

331.    This is a claim for treble damages and for forfeitures under the False Claims Act 31 U.S.C. §§ 3729 et seq., as amended.

332.    Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies among themselves and with others to defraud the United States and state Medicaid programs by getting false and fraudulent claims allowed or paid.  Defendants have also conspired to omit disclosing or to actively conceal facts, which, if known, would have reduced government obligations to them, or resulted in repayments from them to government programs. Defendants have taken substantial steps in furtherance of those conspiracies, inter alia, by preparing false reports and other records and by submitting such records to the Government for payment and approval.

333.    The United States, its fiscal intermediaries, and state Medicaid program, unaware of defendants' conspiracies and falsity of the records, statements and claims made by defendants and their agents, employees and co-conspirators, and a result thereof, have paid and continue to pay billions of dollars in Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA,    the    Federal    Employee    Benefits    Program

reimbursement that they would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions by defendants and their agents, employees and co-conspirators, the United States, its fiscal intermediaries, and state Medicaid programs have not recovered Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Benefits Program funds from the defendants that otherwise would have been recovered.

334.    By reason of defendants' conspiracies and the acts taken in furtherance thereof, the United States and the state Medicaid programs have been damaged in the amount of many billions of dollars in Medicare, Medicaid, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Benefits Program funds.

**COUNT III**
**SOCIAL SECURITY ACT ("SSA")**

**[SSA AND HIPAA 42 U.S.C. § 1320a-7(b)(6)(B), (13)]**

335.    Mr. Potts incorporates all previous allegations as if fully set forth again here. As described above, Defendants, by and through their officers, agents and employees, failed to meet professionally recognized and federally and state mandated standards of pharmacy services.

336.    As described above, Defendants, by and through their officers, agents and employees, *per se* violated OBRA 90, MMA and each of the several state's laws and regulations pursuant thereto.

337.    Each of the actions described in the Paragraphs within Count IV is a violation of the Social Security Act and HIPAA, 42 U.S.C. § 1320a-7(b)(6)(B), (13), for which Defendants are liable for damages as mandated by the statute.

**COUNT IV**
**HEALTH   INSURANCE   PORTABILITY   AND   ACCOUNTABILITY   ACT ("HIPAA")**

**[HIPAA § 1347(2)]**

338.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

339.    As described above, Defendants, by and through their officers, agents and employees, knowingly and willfully executes, or attempts to execute, a scheme or artifice to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

126

340.    Each of the actions described in the Paragraphs within Count V is a violation of HIPAA § 1347(2), for which Defendants are liable for damages as mandated by the statute.

**STATE FALSE CLAIMS:**

**COUNT V**
**GEORGIA STATE FALSE MEDICAID CLAIMS ACT**

**[GSFMCA § 49-4-168.1 (a)(1), (2), (3) and (7)]**

341.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

342.    Defendants have repeatedly and continuously violated the Georgia State False Medicaid Claims Act (hereinafter "GSFMCA").

343.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting or causing to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval.

344.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program.

345.    As described above, Defendants, by and through their officers, agents and employees, conspired to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

346.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

347.    The United States of America has been damaged as a result of the Defendants' violation of the GSFMCA.

348.    Each of the actions described in Paragraphs within COUNT V is a violation of the GSFMCA § 49-4-168.1 (a)(1), (2), and (7), for which Defendants are liable for damages as mandated by the statute.

**COUNT VI**
**CALIFORNIA FALSE CLAIMS ACT**

**[CA GOVERNMENT CODE SECTIONS 12650-12656, 12651(a)(1)(2)(3)(7)]**

349.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

350.    Defendants have repeatedly and continuously violated the California False Claims Act.

351.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting or causing to be presented a false or fraudulent claim for payment or approval.

352.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

353.    As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of this subdivision.

354.    The United States of America has been damaged as a result of the Defendants' violation of the California False Claims Act.

355.    Each of the actions described in Paragraphs within COUNT VI is a violation of the California False Claims Act, § 12651(a)(1), (2), (3) and (7), for which Defendants are liable for damages as mandated by the statute.

**COUNT VII**
**COLORADO MEDICAL ASSISTANCE ACT**

**[Colo. Rev. Stat. §§ 25.5-4-304 to 25.5-4-310, 25.5-4-305 (a), (b) and (g)]**

356.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

357.    Defendants have repeatedly and continuously violated the Colorado Medical Assistance Act.

358.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting, or causing to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval.

359.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, or causing to be made or used a false record or statement material to a false or fraudulent claim.

360.    As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of this subsection of the Colorado Medical Assistance Act.

361.    The United States of America has been damaged as a result of the Defendants' violation of the Colorado Medical Assistance Act.

362.    Each of the actions described in Paragraphs within COUNT VII is a violation of the Colorado Medical Assistance Act § 25.5-4-305 (a), (b), and (g), for which

Defendants are liable for damages as mandated by the statute.

**COUNT VIII**
**The Connecticut False Claims Act**

**[Conn. Gen. Stat. § 17b-301b]**

363.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

364.    Defendants have repeatedly and continuously violated the Connecticut False Claims Act.

365.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly in presenting, or causing to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services.

366.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, or causing to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

367.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state by securing the allowance or payment of a false

or fraudulent claim under a medical assistance program administered by the Department of Social Services.

368.   The United States of America has been damaged as a result of the Defendants' violation of the Connecticut False Claims Act.

369.   Each of the actions described in Paragraphs within COUNT VIII is a violation of the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b(a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**Count IX**
**Delaware False Claims and Reporting Act**

**[Del. Code Ann. tit. 6, §§ 1201-1209, 1201(a)(1), (2), and (3)]**

370.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

371.   Defendants have repeatedly and continuously violated the Connecticut False Claims Act.

372.   As described above, Defendants, by and through their officers, agents and employees, acted knowingly by presenting, or causing to be presented to an officer or employee of the Government a false or fraudulent claim for payment or approval.

373.   As described above, Defendants, by and through their officers, agents and employees, acted knowingly by

making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

374.     As described above, Defendants, by and through their officers, agents and employees conspired to defraud the Government by getting false or fraudulent claim(s) allowed or paid.

375.     The United States of America has been damaged as a result of the Defendants' violation of the Delaware False Claims and Reporting Act.

376.     Each of the actions described in Paragraphs within COUNT IX is a violation of the Delaware False Claims and Reporting Act, tit. 6, § 1201(a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**COUNT X**
**The District of Columbia False Claims Law**

**[D.C. Code Ann. §§ 2-308.13-20]**

377.     Mr. Potts incorporates all previous allegations as if fully set forth again here.

378.     Defendants have repeatedly and continuously violated the District of Columbia False Claims Law.

379.     As described above, Defendants, by and through their officers, agents and employees, knowingly present, or

cause to be presented, to an officer or employee of the District a false claim for payment or approval.

380.    As described above, Defendants, by and through their officers, agents and employees, knowingly make, use, or cause to be made or used, a false record or statement to get a false claim paid or approved by the District.

381.    As described above, Defendants, by and through their officers, agents and employees conspire to defraud the District by getting a false claim allowed or paid by the District.

382.    The United States of America has been damaged as a result of the Defendants' violation of the District of Columbia False Claims Law.

383.    Each of the actions described in Paragraphs within COUNT X is a violation of the District of Columbia False Claims Law, D.C. Code Ann. §§ 2-308.14 (a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**COUNT XI**
**FLORIDA FALSE CLAIMS ACT**

**[Fla. Stat. Ann. §§ 68.081-68.092, 68.082(2)(a), (b) and (c)]**

384.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

385.    Defendants  have  repeatedly  and  continuously violated the Florida False Claims Act.

386.    As  described  above,  Defendants,  by  and  through their officers, agents and employees, acted knowingly by presenting, or causing to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval.

387.    As  described  above,  Defendants,  by  and  through their officers, agents and employees, acted knowingly by making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

388.    As  described  above,  Defendants,  by  and  through their officers, agents and employees conspired to submit false or fraudulent claim(s) to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

389.    The United States of America has been damaged as a result of the Defendants' violation of the Florida False Claims Act.

390.    Each  of  the  actions  described  in  Paragraphs within COUNT XI is a violation of the Florida False Claims Act § 68.082(2)(a), (b) and (c), for which Defendants are liable for damages as mandated by the statute.

**COUNT XII**
**Hawaii False Claims Acts**

**[§ 661-21, 661-21(a)(1), (2) (3) and (8)]**

391.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

392.   Defendants have repeatedly and continuously violated the Hawaii False Claims Acts.

393.   As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or cause to be presented to an officer or employee of the State a false or fraudulent claim for payment or approval.

394.   As described above, Defendants, by and through their officers, agents and employees, knowingly make, use or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State.

395.   As described above, Defendants, by and through their officers, agents and employees conspired to defraud the State by getting a false or fraudulent claim allowed or paid.

396.   As described above, Defendants, by and through their officers, agents and employees are beneficiaries of an inadvertent submission of a false claim to the State, who subsequently discovered the falsity of the claim, and

failed to disclose the false claim to the State within a reasonable time after discovery of the false claim.

397.    The United States of America has been damaged as a result of the Defendants' violation of the Hawaii False Claims Acts.

398.    Each of the actions described in Paragraphs within COUNT XII is a violation of the Hawaii False Claims Acts § 661.21(a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**COUNT XIII**
**Illinois False Claims Act**

**[740 ILCS 175/1-8, Sec. 3(a)(1)(A), (B) and (C)]**

399.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

400.    Defendants have repeatedly and continuously violated the Illinois False Claims Act.

401.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by presenting, or causing to be presented a false or fraudulent claim for payment or approval.

402.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly by making, using or causing to be made or used a false record or statement material to a false or fraudulent claim.

137

403.     As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of subparagraph (A), (B) of Sec. 3(a)(1) of the Illinois False Claims Act.

404.     The United States of America has been damaged as a result of the Defendants' violation of the Illinois False Claims Act.

405.     Each of the actions described in Paragraphs within COUNT XIII is a violation of the Illinois False Claims Act, 740 ILCS 175/ § 3(a)(1)(A), (B) and (C), for which Defendants are liable for damages as mandated by the statute.

**COUNT XIV**
**Indiana False Claims and Whistleblower Protection Act**
**[Ind. Code § 5-11-5.5, Sec. 2(b)(1), (2), (7) and (8)]**

406.     Mr. Potts incorporates all previous allegations as if fully set forth again here.

407.     Defendants have repeatedly and continuously violated the Indiana False Claims and Whistleblower Protection Act.

408.     As described above, Defendants, by and through their officers, agents and employees, acted knowingly or intentionally by presenting to the state a false claim for payment or approval.

409.    As described above, Defendants, by and through their officers, agents and employees, acted knowingly or intentionally by making or using a false record or statement to obtain payment or approval of a false claim from the state.

410.    As described above, Defendants, by and through their officers, agents and employees conspired with another person to perform an act described in subdivisions (1) through (6) of Sec. 2(b) of the Indiana False Claims and Whistleblower Protection Act, or caused or induced another person to perform an act described in subdivisions (1) through (6).

411.    The United States of America has been damaged as a result of the Defendants' violation of the Indiana False Claims and Whistleblower Protection Act.

412.    Each of the actions described in Paragraphs within COUNT XIV is a violation of the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5-2(b)(1), (2), (7) and (8), for which Defendants are liable for damages as mandated by the statute.

**COUNT XV**
**Louisiana Medical Assistance Programs Integrity Law**

**[La. Rev. Stat. Ann. § 438, 438.3 A., B. C., D.(1), D.(2), D.(3), E., 438.4 A.]**

413.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

414.    Defendants have repeatedly and continuously violated the Louisiana Medical Assistance Programs Integrity Law.

415.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented a false or fraudulent claim.

416.    As described above, Defendants, by and through their officers, agents and employees, knowingly engaged in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds.

417.    As described above, Defendants, by and through their officers, agents and employees, conspired to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

418.    As described above, Defendants, by and through their officers, agents and employees, knowingly submitted a claim for goods, services, or supplies which were medically unnecessary or which were of substandard quality or quantity.

419.    As described above, Defendants, by and through their officers, agents and employees, failed to provide

medically necessary goods, services, or supplies – or goods, services, or supplies which were of substandard quality or quantity to a recipient, and those goods, services, or supplies are covered under a managed care contract or voucher contract with the medical assistance programs.

420. As described above, Defendants, by and through their officers, agents and employees, provided "substandard quality" services as to the appropriate standard of care as used to determine medical malpractice, including but not limited to, the standard of care provided in R.S. 9:2794.

421. As described above, Defendants, by and through their officers, agents and employees, Knowingly made, used, or caused to be made or used a false, fictitious, or misleading statement on any form used for the purpose of certifying or qualifying any person for eligibility for the medical assistance programs or to receive any good, service, or supply under the medical assistance programs which that person is not eligible to receive.

422. The United States of America has been damaged as a result of the Defendants' violation of the Louisiana Medical Assistance Programs Integrity Law.

423. Each of the actions described in Paragraphs within COUNT XV is a violation of the Louisiana Medical

Assistance Programs Integrity Law, La. Rev. Stat. Ann. §
438, for which Defendants are liable for damages as
mandated by the statute.

**COUNT XVI**
**Maryland False Claims Act**

**[§§ 2-601 to 2-611, 2-602(a)(1), (2) and (3)]**

424.    Mr. Potts incorporates all previous allegations
as if fully set forth again here.

425.    Defendants have repeatedly and continuously
violated the Maryland False Claims Act.

426.    As described above, Defendants, by and through
their officers, agents and employees, knowingly presented
or caused to be presented a false or fraudulent claim for
payment or approval.

427.    As described above, Defendants, by and through
their officers, agents and employees, knowingly made, used,
or caused to be made or used a false record or statement
material to a false or fraudulent claim.

428.    As described above, Defendants, by and through
their officers, agents and employees, conspired to commit a
violation under this subtitle, § 2-602.

429.    The United States of America has been damaged as
a result of the Defendants' violation of the Maryland False
Claims Act.

430.    Each  of  the  actions  described  in  Paragraphs within  COUNT  XVI  is  a  violation  of  the  Maryland  False Claims  Act,  §§  2-601  to  2-611,  2-602(a)(1),  (2)  and  (3), for  which  Defendants  are  liable  for  damages  as  mandated  by the  statute.

**COUNT XVII**
**Massachusetts False Claims Act**

**[Mass. Gen. Laws Ann. Ch. 12, §§ 5-50, 5B (1), (2), (3), (7) and (9)]**

431.    Mr.  Potts  incorporates  all  previous  allegations as  if  fully  set  forth  again  here.

432.    Defendants  have  repeatedly  and  continuously violated  the  Massachusetts  False  Claims  Act.

433.    As  described  above,  Defendants,  by  and  through their  officers,  agents  and  employees,  knowingly  presented, or  caused  to  be  presented,  a  false  or  fraudulent  claim  for payment  or  approval.

434.    As  described  above,  Defendants,  by  and  through their  officers,  agents  and  employees,  knowingly  made,  used, or  caused  to  be  made  or  used,  a  false  record  or  statement to  obtain  payment  or  approval  of  a  claim  by  the commonwealth  or  any  political  subdivision  thereof.

435.    As  described  above,  Defendants,  by  and  through their  officers,  agents  and  employees  conspired  to  defraud

**143**

the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim.

436.    As described above, Defendants, by and through their officers, agents and employees entered into an agreement, contract or understanding with one or more officials of the commonwealth or any political subdivision thereof knowing the information contained therein is false.

437.    As described above, Defendants, by and through their officers, agents and employees are a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and failed to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

438.    The United States of America has been damaged as a result of the Defendants' violation of the Massachusetts False Claims Act.

439.    Each of the actions described in Paragraphs within COUNT XVII is a violation of the Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12, §§ 5-50, 5B (1), (2), (3), (7) and (9), for which Defendants are liable for damages as mandated by the statute.

**COUNT XVIII**

**144**

**Michigan Medicaid False Claim Act**

**[Mich. Comp. Laws §§ 400.601-400.612, 400.606(1), 400.607(1), 400.607(2), 400.612(1) and (2)]**

440.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

441.    Defendants have repeatedly and continuously violated the Michigan False Claim Act.

442.    As described above, Defendants, by and through their officers, agents and employees, entered into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare Act No. 280 of the Public Acts of 1939, as amended being sections 400.1 to 400.121 of the Michigan Compiled Laws.

443.    As described above, Defendants, by and through their officers, agents and employees, made or presented or caused to be made or presented to an employee or officer of Michigan a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false.

444.    As described above, Defendants, by and through their officers, agents and employees, made or presented or caused to be made or presented a claim(s) under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, that

**145**

Defendants know falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards and the Defendants in a conspiracy, combination, or collusion with a physician or other provider falsely represents the medical necessity of the particular goods or services for which the claim was made – and each claim in this subsection is a separate offense.

445.    As described above, Defendants, by and through their officers, agents and employees, received a benefit that Defendants were not entitled to receive by reason of fraud or making a fraudulent statement or knowingly concealing a material fact, or engaged in conduct prohibited by the Michigan Medicaid False Claim Act.

446.    The United States of America has been damaged as a result of the Defendants' violation of the Michigan Medicaid False Claim Act.

447.    Each of the actions described in Paragraphs within COUNT XVIII is a violation of the Michigan Medicaid False Claim Act, Mich. Comp. Laws §§ 400.601-400.612, for which Defendants are liable for damages as mandated by the statute.

**COUNT XIX**
**Minnesota False Claims Act**

146

**[Minn. Stat. Ann. §§ 15C.01-15C.16, 15C.02 (1), (2), (3) and (7)]**

448.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

449.    Defendants have repeatedly and continuously violated the Minnesota False Claims Act.

450.    As described above, Defendants, by and through their officers, agents and employees, knowingly present, or caused to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval.

451.    As described above, Defendants, by and through their officers, agents and employees, knowingly made or used, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision.

452.    As described above, Defendants, by and through their officers, agents and employees knowingly conspired to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or make, use, or cause to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

453.    As  described  above,  the  activities  involving false  or  fraudulent  claims  of  Defendants,  by  and  through their  officers,  agents  and  employees  did  not  result  due  to mere  negligence,  inadvertence  or  mistake.

454.    The  United  States  of  America  has  been  damaged  as a  result  of  the  Defendants'  violation  of  the  Minnesota False  Claims  Act.

455.    Each  of  the  actions  described  in  Paragraphs within  COUNT  XIX  is  a  violation  of  the  Minnesota  False Claims  Act,  Minn.  Stat.  §  15C.01  *et  seq.*,  for  which Defendants  are  liable  for  damages  as  mandated  by  the statute.

**COUNT XX**
**MONTANA FALSE CLAIMS ACT**

**[§§ 17-8-401 TO 17-8-413, § 17-8-403(a), (b), (c) and (h)]**

456.    Mr.  Potts  incorporates  all  previous  allegations as  if  fully  set  forth  again  here.

457.    Defendants  have  repeatedly  and  continuously violated  the  Montana  False  Claims  Act.

458.    As  described  above,  Defendants,  by  and  through their  officers,  agents  and  employees,  knowingly  present,  or caused  to  be  presented  to  an  officer  or  employee  of  the government  entity  a  false  claim  for  payment  or  approval.

459.     As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the governmental entity.

460.     As described above, Defendants, by and through their officers, agents and employees conspired to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

461.     As described above, the activities involving false or fraudulent claims of Defendants, by and through their officers, agents and employees are beneficiaries of an inadvertent submission of a false claim to the governmental entity, subsequently discovered the falsity of the claim and failed to disclose the false claim to the governmental entity within a reasonable time after discovery of the false claim.

462.     The United States of America has been damaged as a result of the Defendants' violation of the Montana False Claims Act.

463.     Each of the actions described in Paragraphs within COUNT XX is a violation of the Montana False Claims Act, Minn. Stat. §§ 17-8-401 *et seq.*, for which Defendants are liable for damages as mandated by the statute.

**149**

**COUNT XXI**
**NEVADA FALSE CLAIMS ACT**

**[Nev. Rev. Stat. Ann. §§ 357.010-357.250, 357.040(1)(a),**
**(b), (c) and (h)]**

464.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

465.    Defendants have repeatedly and continuously violated the Nevada False Claims Act.

466.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented a false claim(s) for payment or approval.

467.    As described above, Defendants, by and through their officers, agents and employees, knowingly made or used, or caused to be made or used, a false record or statement to obtain payment or approval of a false claim.

468.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud by obtaining allowance or payment of a false claim.

469.    As described above, Defendants, by and through their officers, agents and employees are a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, failed to disclose the falsity to the State or political subdivision within a reasonable time.

470.     The United States of America has been damaged as a result of the Defendants' violation of the Nevada False Claims Act.

471.     Each of the actions described in Paragraphs within COUNT XXI is a violation of the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010-357.250, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXII**
**New Hampshire Health Care False Claims Law**

**[§§ 167:61-b(I)(a), (b), (c) and (f)]**

472.     Mr. Potts incorporates all previous allegations as if fully set forth again here.

473.     Defendants have repeatedly and continuously violated the New Hampshire Health Care False Claims Law.

474.     As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

475.     As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement

151

to get a false or fraudulent claim paid or approved by the department.

476.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the department by getting a false or fraudulent claim allowed or paid.

477.    As described above, Defendants, by and through their officers, agents and employees are beneficiaries of an inadvertent submission of a false claim to the department, who subsequently discovered the falsity of the claim, and failed to disclose the false claim to the department within a reasonable time after discovery of the false claim.

478.    The United States of America has been damaged as a result of the Defendants' violation of the New Hampshire Health Care False Claims Law.

479.    Each of the actions described in Paragraphs within COUNT XXII is a violation of the New Hampshire Health Care False Claims Law, §§ 167:61-b(I)(a), (b), (c) and (f), for which Defendants are liable for damages as mandated by the statute.

**COUNT XXIII**
**New Jersey False Claims Act**

[N.J. Stat. Ann. §§ 2A:32C-1 through 2A:32C-15]

480.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

481.    Defendants have repeatedly and continuously violated the New Jersey False Claims Act.

482.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval.

483.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State.

484.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

485.    The United States of America has been damaged as a result of the Defendants' violation of the New Jersey False Claims Act.

486.    Each of the actions described in Paragraphs within COUNT XXIII is a violation of the New Jersey False

Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 through 2A:32C-15,

for which Defendants are liable for damages as mandated by

the statute.

**COUNT XXIV**
**New Mexico Medicaid False Claims Act**

**[§§ 27-14-1 to 27-14-15, § 27-14-4 A., B., C., D., G. and H]**

487.    Mr. Potts incorporates all previous allegations

as if fully set forth again here.

488.    Defendants have repeatedly and continuously

violated the New Mexico Medicaid False Claims Act.

489.    As described above, Defendants, by and through

their officers, agents and employees, presented, or caused

to be presented, to the state a claim for payment under the

Medicaid program knowing that such claim is false or

fraudulent.

490.    As described above, Defendants, by and through

their officers, agents and employees, presented, or caused

to be presented, to the state a claim for payment under the

Medicaid program knowing that the person receiving a

Medicaid benefit or payment is not authorized or is not

eligible for a benefit under the Medicaid program.

491.    As described above, Defendants, by and through

their officers, agents and employees, made, used or caused

to be made or used a record or statement to obtain a false

or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false

492.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

493.    As described above, Defendants, by and through their officers, agents and employees knowingly made a false statement or misrepresentation of material fact concerning the conditions or operation of a health care facility in order that the facility may qualify for certification or recertification required by the Medicaid program.

494.    As described above, Defendants, by and through their officers, agents and employees knowingly made a claim under the Medicaid program for a service or product that was not provided.

495.    The United States of America has been damaged as a result of the Defendants' violation of the New Mexico Medicaid Fraud Claims Act.

496.    Each of the actions described in Paragraphs within COUNT XXIV is a violation of the New Mexico Medicaid False Claims Act, §§ 27-14-1 to 27-14-15, for which

**155**

Defendants are liable for damages as mandated by the statute.

**COUNT XXV**
**New Mexico Fraud Against Taxpayers Act**

**[§§ 44-9-1 to 44-9-14, § 44-9-3-A. (1), (2), (3) and (9)]**

497.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

498.    Defendants have repeatedly and continuously with or without specific intent have violated the New Mexico Fraud Against Taxpayers Act.

499.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval.

500.    As described above, Defendants, by and through their officers, agents and employees, knowingly made or used, or caused to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim.

501.    As described above, Defendants, by and through their officers, agents and employees, conspired to defraud

the state by obtaining approval or payment on a false or fraudulent claim.

502.    As described above, Defendants, by and through their officers, agents and employees, as a beneficiary of an inadvertent submission of a false claim and having subsequently discovered the falsity of the claim, failed to disclose the false claim to the state within a reasonable time after discovery.

503.    The United States of America has been damaged as a result of the Defendants' violation of the New Mexico Medicaid Fraud Against Taxpayers Act.

504.    Each of the actions described in Paragraphs within COUNT XXV is a violation of the New Mexico Fraud Against Taxpayers Act, §§ 44-9-1 to 44-9-14, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXVI**
**New York State False Claims Act**

**[§§ 187 *et seq.*, § 189.1(a), (b) and (c)]**

505.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

506.    Defendants have repeatedly and continuously violated the New York State False Claims Act.

507.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented a false or fraudulent claim for payment or approval.

508.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim.

509.    As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of paragraph (a), (b) of this subdivision (§ 189.1).

510.    The United States of America has been damaged as a result of the Defendants' violation of the New York State False Claims Act.

511.    Each of the actions described in Paragraphs within COUNT XXVI is a violation of the New York State False Claims Act §§ 187 *et seq.*, § 189.1(a), (b) and (c), for which Defendants are liable for damages as mandated by the statute.

**COUNT XXVII**
**North Carolina False Claims Act**

**[§§ 1-605 *et seq.*, §§ 1-607(a)(1), (2) and (3)]**

512.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

513.    Defendants have repeatedly and continuously violated the North Carolina False Claims Act.

514.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented a false or fraudulent claim for payment or approval.

515.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

516.    As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of subdivision (1), (2) and (3) of this section (§ 1-607).

517.    The United States of America has been damaged as a result of the Defendants' violation of the North Carolina False Claims Act.

518.    Each of the actions described in Paragraphs within COUNT XXVII is a violation of the North Carolina False Claims Act §§ 1-607(a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**COUNT XXVIII**
**Oklahoma Medicaid False Claims Act**

**[Okla. Stat. tit. 63. §§ 5053-5053.7, § 5053.1 B. (1), (2) and (3)]**

519.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

520.    Defendants have repeatedly and continuously violated the Oklahoma Medicaid False Claims Act.

521.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval.

522.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state.

523.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state by getting a false or fraudulent claim allowed or paid.

524.    The United States of America has been damaged as a result of the Defendants' violation of the Oklahoma Medicaid False Claims Act.

525.    Each  of  the  actions  described  in  Paragraphs within COUNT XXVIII is a violation of the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63. §§ 5053-5053.7, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXIX**
**Rhode Island State False Claims Act**

**[§§ 9-1.1 *et seq.*, §§ 9-1.1-3(a)(1), (2) and (3)]**

526.    Mr. Potts  incorporates  all  previous  allegations as if fully set forth again here.

527.    Defendants  have  repeatedly  and  continuously violated the Rhode Island State False Claims Act.

528.    As  described  above,  Defendants,  by  and  through their officers, agents and employees, knowingly presented, or caused to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval.

529.    As  described  above,  Defendants,  by  and  through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State.

530.    As  described  above,  Defendants,  by  and  through their officers, agents and employees conspired to defraud

161

the State by getting a false or fraudulent claim allowed or paid.

531.    The United States of America has been damaged as a result of the Defendants' violation of the Rhode Island False Claims Act.

532.    Each of the actions described in Paragraphs within COUNT XXIX is a violation of the Rhode Island False Claims Act, §§ 9-1.1 et seq., §§ 9-1.1-3(a)(1), (2) and (3), for which Defendants are liable for damages as mandated by the statute.

**COUNT XXX**
**Tennessee False Claims Act**
**[Tenn. Code Ann. §§ 4-18-101 to 4-18-108, 4-18-103(a) (1), (2), (3), (8) and (9)]**

533.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

534.    Defendants have repeatedly and continuously violated the Tennessee False Claims Act.

535.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

536.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision.

537.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

538.    As described above, Defendants, by and through their officers, agents and employees, are beneficiaries of an inadvertent submission of a false claim to the state or a political subdivision, who subsequently discovered the falsity of the claim, and failed to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

539.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision.

163

540.   The United States of America has been damaged as a result of the Defendants' violation of the Tennessee False Claims Act.

541.   Each of the actions described in Paragraphs within COUNT XXX is a violation of the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to 4-18-108, for which Defendants are liable for damages as mandated by the statute.

**COOUNT XXXI**
**Texas Medicaid Fraud Prevention Law**

**[Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132, 36.002(4)(A), (7), (9), and (10)]**

542.   Mr. Potts incorporates all previous allegations as if fully set forth again here.

543.   Defendants have repeatedly and continuously violated the Texas Medicaid Fraud Prevention Law.

544.   As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

545.   As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to

get a false claim paid or approved by the state or by any political subdivision.

546.    As described above, Defendants, by and through their officers, agents and employees knowingly entered into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent.

547.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, caused to be made, induce, or seek to induce the making of a false statement or misrepresentation of material fact concerning the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification of Defendants' hospitals and facilities.

548.    As described above, Defendants, by and through their officers, agents and employees, knowingly made or caused to be made a claim under the Medicaid program for a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner; a service or product that is substantially inadequate or inappropriate when compared to generally recognized

standards within the particular discipline or within the health care industry; or a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate.

549. As described above, Defendants, by and through their officers, agents and employees are a managed care organization that contracts with the Health and Human Services Commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly failed to provide to an individual a health care benefit or service that the organization is required to provide under the contract.

550. The United States of America has been damaged as a result of the Defendants' violation of the Texas Medicaid Fraud Prevention Law.

551. Each of the actions described in Paragraphs within COUNT XXXI is a violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXXII**
**Virginia Fraud Against Taxpayers Act**

**[Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19, § 8.01-216.3 A. (1), (2) and (3)]**

552.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

553.    Defendants have repeatedly and continuously violated the Virginia Fraud Against Taxpayers Act.

554.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

555.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

556.    As described above, Defendants, by and through their officers, agents and employees conspired to commit a violation of subdivision 1 and 2 of § 8.01-216.3 A.

557.    The United States of America has been damaged as a result of the Defendants' violation of the Virginia Fraud Against Taxpayers Act.

558.    Each of the actions described in Paragraphs within COUNT XXXII is a violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19, for which Defendants are liable for damages as mandated by the statute.

**COUNT XXXIII**
**Wisconsin False Claims For Medical Assistance Act**

**[§§ 20.931 *et seq.*, §§ 20.931(2)(a), (b), (c) and (h)]**

559.    Mr. Potts incorporates all previous allegations as if fully set forth again here.

560.    Defendants have repeatedly and continuously violated the Wisconsin False Claims For Medical Assistance Act.

561.    As described above, Defendants, by and through their officers, agents and employees, knowingly presented or caused to be presented to an officer, employee, or agent of this state a false claim for medical assistance.

562.    As described above, Defendants, by and through their officers, agents and employees, knowingly made, used, or caused to be made or used a false record or statement to obtain approval or payment of a false for medical assistance.

563.    As described above, Defendants, by and through their officers, agents and employees conspired to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to

pay or transmit money or property to the Medical Assistance program.

564.    The United States of America has been damaged as a result of the Defendants' violation of the Wisconsin False Claims For Medical Assistance Act.

565.    Each of the actions described in Paragraphs within COUNT XXXIII is a violation of the Wisconsin False Claims For Medical Assistance Act, §§ 20.931 *et seq.*, §§ 20.931(2)(a), (b), (c) and (h), for which Defendants are liable for damages as mandated by the statute.

## VII. **PRAYER FOR RELIEF**

1. Mr. Potts respectfully prays that Defendants be cited to appear and answer herein and that upon a final hearing of the cause, that judgment be entered for the United States and Mr. Potts against Defendants as follows:

A. As to violation of the False Claims Act, the following:

i.    The defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

ii.   Judgment against Defendants, in an amount equal to three times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty against each defendant

of $10,000.00 for each violation of 31 U.S.C. § 3729, the costs of this action, with interest, including the cost to the United States of America for its expenses related to this action;

iii.   Relator awarded all costs incurred, including reasonable attorneys' fees;

iv.   In the event the United States of America proceeds with this action, that the Relator be awarded an amount for bringing this action of at least 15%, but not more than 25% of the proceeds of the action or settlement of the claim;

v.   In the event the United States of America does not proceed with this action, that the Relator be awarded the amount the Court determines is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of the action or settlement;

vi.   Relator awarded prejudgment interest;

vii.   United States of America and Relator receive all relief, both at law and equity, to which they may reasonably appear entitled.

B. As to violations of the Social Security Act, the following:

      i.   Defendants, individuals and entities, be excluded from participation in any Federal health care program as defined in § 1320a-7b(f).

C. As to violations of HIPAA, the following;

      i.   Defendants, individuals and entities, be imprisoned for not more than 10 years, a $250,000 fine, or both, for each scheme not resulting in bodily injury;

     ii.   Defendants, individuals and entities, be imprisoned for not more than 20 years, for each scheme resulting in bodily injury; and

   iii.   Defendants, individuals and entities, be imprisoned where a life sentence may be imposed for each instance of patient death resulting from Defendants' scheme to defraud.

D. Relator further requests all other relief to which Plaintiff United States of America and Relator James Hugh Potts II are justly entitled, whether in law or in equity.

E. As to violations of the Georgia State False Medicaid Claims Act, the following:

      i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program,

directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A penalty not less than $5,500.00 or more than $11,000.00 for each false or fraudulent claim, plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under § 49-4-168, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

F. As to violations of the California False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

172

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. A penalty of three times the amount of damages that the state or political subdivision sustains because of the acts of Defendants or the costs of this civil action brought to recover any of those penalties or damages and a civil penalty of not less than $5,000.00 or more than $10,000.00 for each violation.

iv. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the California False Claims Act §§ 12650-12656, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

G. As to violations of the Colorado Medical Assistance Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

**173**

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation, plus three times the amount of damages that the state sustains because of the acts of Defendants.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Colorado Medical Assistance Act, Colo. Rev. Stat. §§ 25.5-4-304 to 25.5-4-310, 25.5-4-305 (a), (b) and (g), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

H. As to violations of the Connecticut False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

174

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation, plus three times the amount of damages that the state sustains because of the acts of Defendants, and the costs of investigation and prosecution of the violations.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Connecticut False Claims Act § 17b-301b(a)(1), (2) and (3), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

I. As to violations of the Delaware False Claims and Reporting Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

**175**

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A civil penalty of not less than $5,500.00 and not more than $11,000 for each act constituting a violation of this section, plus 3 times the amount of damages, which the Government sustains because of the act(s) of Defendants.

iv.   Defendants be held liable the costs of a civil action brought to recover any such penalty or damages, including payment of reasonable attorneys fees and costs for violations of this statute.

v.    Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201-1209, 1201(a)(1), (2), (3) and (c), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

J. As to violations of the District of Columbia False Claims Law, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each false claim, plus three times the amount of damages that the District sustains because of the acts of Defendants, and the costs of investigation and prosecution of the violations.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the District of Columbia False Claims Law § 2-308.14(a)(1), (2) and (3), whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

K. As to violations of the Florida False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation, plus three times the amount of damages that the agency sustains because of the act(s) or omission(s) of Defendants, and the costs of investigation and prosecution of the violations.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Florida False Claims Act § 68.082(2)(a), (b) and (c), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

L. As to violations of the Hawaii False Claims Acts, the following:

178

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation, plus three times the amount of damages that the State sustains due to the act(s) of Defendants, and the costs of investigation and prosecution of the violations.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Hawaii False Claims Acts § 661.21(a)(1), (2), (3) and (8), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

M. As to violations of the Illinois False Claims Act, the following:

**179**

i.  Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.  Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation, plus three times the amount of damages that the State sustains because of each act of Defendants, and the costs of investigation and prosecution of the violations.

iv.  Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Illinois False Claims Act § 3(a)(1)(A), (B) and (C), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

N. As to violations of the Indiana False Claims and Whistleblower Protection Act, the following:

180

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of at least $5,000.00 and for up to 3 times the amount of damages sustained by the state, plus the costs of a civil action brought to recover a penalty or damages.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5, whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

O. As to violations of the Louisiana Medical Assistance Programs Integrity Law, the following:

i.   Judgment against the Defendants for the actual damages incurred as a result of a violation of the

**181**

provisions of this Part shall be recovered only once by the medical assistance programs and shall not be waived by the court.

ii.   The actual damages actual damages shall equal the difference between what the medical assistance programs paid, or would have paid, and the amount that should have been paid had not a violation of this Part occurred plus interest at the maximum rate of legal interest provided by Civil Code Article 2924 from the date the damage occurred to the date of repayment.

iii.   For any managed care or health care provider voucher programs in which Defendants participate, the actual damages shall be determined in accordance with the violator's provider agreement.

iv.   A civil fine in an amount not to exceed 3 times the amount of actual damages sustained by the medical assistance programs as a result of the violation.

v.   A civil penalty in addition to the actual damages and civil fine of up to $10,000.00 for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act as contained in R.S. 46:438.2, R.S. 46:438.3, or 46:438.4.

vi.   Payment of interest on the amount of the civil fine imposed pursuant to Subsection B of this Section

at the maximum rate of legal interest provided by Civil Code Article 2924 from the date the damage occurred to the date of repayment.

vii. All costs, expenses, and fees related to investigations and proceeding associated with the violation including attorney fees.

viii. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 438, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

P. As to violations of the Maryland False Claims Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not more than $10,000.00 for each violation of subsection (a) of this section (2-602), plus not more than three times the amount of damages that the state sustains as a result of the acts of Defendants in violation of subsection (a) of 2-602.

iv.   Expenses of the civil action brought to recover any such penalty or damages, including court costs and attorney's fees.

v.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Maryland False Claims Act, §§ 2-601 to 2-611, § 2-602(a)(1), (2) and (3), whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

Q. As to violations of the Massachusetts False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

**184**

ii.  Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A civil penalty of not less than $5,000.00 and not more than $10,000.00 per violation, plus 3 times the amount of damages, including consequential damages, that the commonwealth or political subdivision sustains because of the acts of Defendants.

iv.  Expenses of the civil action brought to recover any such penalty or damages, including without limitation reasonable attorney's fees, reasonable expert's fees and the costs of investigation, including the costs of any review or investigation undertaken by the attorney general, or by the state auditor or the inspector general in cooperation with the attorney general.

v.  Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 §§ 5-50, 5B (1), (2), (3), (7) and (9), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be

justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

R. As to violations of the Michigan Medicaid False Claim Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. Defendants be found guilty of a felony (felonies), punishable by imprisonment for not more than 10 years, or by a fine of not more than $50,000.00, or both for violating sections 400.606.

iv. Defendants be found guilty of a felony (felonies), punishable by imprisonment for not more than 4 years, or by a fine of not more than $50,000.00, or both for violating sections 400.607.

v. A civil penalty for each claim of not less than $5,000.00 or more than $10,000.00, plus 3 times the

amount of damages suffered by the state as a result of the conduct by the Defendants.

vi.   Expenses of the civil action brought to recover any such penalty or damages, including without limitation reasonable attorney's fees, reasonable expert's fees and the costs of investigation, including the costs of any review or investigation undertaken by the attorney general, or by the state auditor or the inspector general in cooperation with the attorney general.

vii.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Michigan Medical False Claim Act, Mich. Comp. Laws §§ 400.601-400.612, whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

S. As to violations of the Minnesota False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit
described above at the prejudgment rate in effect on
the day the payment or benefit was received or paid,
for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,500.00 and
not more than $11,000.00 per false or fraudulent
claim, plus three times the amount of damages that the
state or the political subdivision sustains because of
the act(s) of Defendants.

iv.   Costs, reasonable attorneys fees, and the
reasonable fees of expert consultants and expert
witnesses.

v.   Plaintiff and Relator invoke in the broadest
sense all relief possible at law or in equity under
the Minnesota False Claims Act, Minn. Stat. § 15C.01
*et seq.*, whether specified in this pleading or not.
Plaintiff will seek an amount as civil penalties that
will be justified and appropriate under the facts
relevant to this issue and under the laws as
determined by this court.

T. As to violations of the Montana False Claims Act, the
following:

i.   Judgment against the Defendants for the value of
any payment provided under the Medicaid program,

**188**

directly or indirectly, as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. A civil penalty of up to $10,000.00 for each of the Defendants' acts, plus not less than two times and not more than three times the amount of damages that a governmental entity sustains because of the Defendants act(s).

iv. Costs and attorney's fees.

v. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Montana False Claims Act, §§ 17-8-401 *et seq.*, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

U. As to violations of the Nevada False Claims Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program,

directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   Three times the amount of damages sustained by the State or political subdivision because of the act of that person, for the costs of a civil action brought to recover those damages and for a civil penalty of not less than $5,000 or more than $10,000 for each act.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010-357.250, whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

V. As to violations of the New Hampshire Health Care False Claims Law, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program,

**190**

directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000.00 and not more than $10,000.00, plus 3 times the amount of damages that the state sustains because of the act(s) of Defendants and for the costs and attorney's fees arising from the civil action brought to recover the penalty or damages.

iv.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the New Hampshire Health Care False Claims Act, §§ 167:61-b(I)(a), (b), (c) and (f), whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

W. As to violations of the New Mexico Fraud Against Taxpayers Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program,

**191**

directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   Three times the amount of damages sustained by the State because of the act(s) of Defendants, for the costs of a civil action brought to recover those damages including reasonable attorney fees and he fees of the attorney general or state agency counsel.

iv.   A civil penalty of not less than $5,000 and not more than $10,000 for each violation.

X. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the New Mexico Fraud Against Taxpayers Act, §§ 44-9-1 to 44-9-14, whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

Y. As to violations of the New York State False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $6,000 or more than $12,000, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act(s) of the Defendants.

iv.   Attorney fees and costs for bringing the civil action to recover the penalty or damages.

v.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the New York State False Claims Act, §§ 187 et seq., § 189.1(a), (b) and (c), whether specified in this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

Z. As to violations of the North Carolina False Claims Act, the following:

   i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

   ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

   iii.   Three times the amount of damages that the State sustains because of the act(s) of Defendants.

   iv.   A civil penalty of not less than $5,500 and not more than $11,000 for each violation.

   v.   Reasonable attorney and investigative fees and costs for bringing the civil action to recover the penalty or damages.

   vi.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the North Carolina False Claims Act, §§ 1-607(a)(1), (2) and (3), whether specified in this pleading or not.  Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts

relevant to this issue and under the laws as determined by this court.

AA.    As to violations of the Oklahoma Medicaid False Claims Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000 or more than $10,000 for each act, plus three times the amount of damages the state sustains because of the act(s) of the Defendants.

iv.   Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' false claims.

v.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63. §§ 5053-5053.7, whether specified in this pleading or not.   Plaintiff will seek an amount as

civil penalties that will be justified and appropriate
under the facts relevant to this issue and under the
laws as determined by this court.

BB.    As to violations of the Rhode Island False Claims
Act, the following:

i.   Judgment against the Defendants for the value of
any   payment   provided   under   the   Medicaid   program,
directly or indirectly, as a result of the unlawful
acts.

ii.   Interest on the value of the payment or benefit
described above at the prejudgment rate in effect on
the day the payment or benefit was received or paid,
for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,000 and not
more than $10,000, plus three (3) times the amount of
damages which the state sustains because of the act(s)
of the Defendants.

iv.   Reasonable   attorney   fees,   expenses   and   costs
incurred for bringing and prosecuting the action to
recover damages and penalties caused by Defendants'.

v.   Plaintiff   and   Relator   invoke   in   the   broadest
sense all relief possible at law or in equity under
the Rhode Island False Claims Act, §§ 9-1.1 *et seq.*,
§§ 9-1.1-3(a)(1), (2) and (3), whether specified in

this pleading or not. Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

CC. As to violations of the Tennessee False Claims Act, the following:

i. Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii. Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii. A civil penalty of not less than $2,500 and not more than $10,000 for each false claim, plus three times the amount of damages that the state or political subdivision sustains because of the act(s) of the Defendants.

iv. Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' false claims.

v. Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under

the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 to 4-18-108, whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

DD.   As to violations of the Texas Medicaid Fraud Prevention Law, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,500 and not more than $15,000 for each unlawful act if that unlawful act results in injury to an elderly person or a person younger than 18 years of age, plus two times the amount of the payment or value of the benefit.

iv.   A civil penalty of not less than $5,500 and not more than $11,000 for each unlawful act if the unlawful act does not result in an injury to an

elderly person or a person younger than 18 years of age, plus two times the amount of the payment or value of the benefit.

v.  Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' false claims.

vi.  Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001 to 36.132, whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

EE.   As to violations of the Virginia Fraud Against Taxpayers Act, the following:

i.  Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.  Interest on the value of the payment or benefit described above at the prejudgment rate in effect on the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.   A civil penalty of not less than $5,500 and not more than $11,000 for each act, plus three times the amount of damages sustained by the Commonwealth.

iv.   Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' violations of the Virginia Fraud Against Taxpayers Act.

v.   Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 to 8.01-216.19, whether specified in this pleading or not.   Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

FF.   As to violations of the Wisconsin False Claims For Medical Assistance Act, the following:

i.   Judgment against the Defendants for the value of any payment provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts.

ii.   Interest on the value of the payment or benefit described above at the prejudgment rate in effect on

the day the payment or benefit was received or paid, for the period from the date restitution is paid.

iii.  A forfeiture of not less than $5,000 nor more than $10,000 for each violation, plus three times the amount of damages sustained by this state because of the actions of the Defendants.

iv.  Attorney fees, expenses and costs for bringing and prosecuting the action regarding Defendants' violations of the Wisconsin False Claims For Medical Assistance Act.

v.  Plaintiff and Relator invoke in the broadest sense all relief possible at law or in equity under the Wisconsin False Claims For Medical Assistance Act, §§ 20.931 *et seq.*, §§ 20.931(2)(a), (b), (c) and (h), whether specified in this pleading or not.  Plaintiff will seek an amount as civil penalties that will be justified and appropriate under the facts relevant to this issue and under the laws as determined by this court.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand trial by jury.

This 12th day of July, 2012.

**201**



James Hugh Potts II
Attorney for Plaintiff
Georgia Bar No. 58567

JAMES HUGH POTTS II, LLC
1348 Ponce de Leon Avenue NE
Atlanta, Georgia 30306
404-812-0000
www.jhpii.com

**202**